**K.M.B. WAREHOUSE DISTRIBUTORS, INC. and KMB/CT, Inc., Plaintiffs–Appellants–Cross–Appellees,**

v.

**WALKER MANUFACTURING COMPANY, Prime Automotive Parts Co., Inc., Woodbury Automotive Warehouse Enterprises, Inc., and Motor Age, Inc., Defendants–Appellees–Cross–Appellants.**

**Nos. 1051, 1254, Dockets 94–7672, 94–7720.**

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1995.

Decided July 21, 1995.

Frederick R. Dettmer, Karen M. Streisfeld, New York City, for plaintiffs-appellants-cross-appellees.

Kenneth E. Newman, Alan B. Howard, Donovan Leisure Newton & Irvine, New York City, for defendant-appellee-cross-appellant Walker Mfg. Co.

Elliott M. Rosenbaum, Gary R. Novins, Misrok & Rosenbaum, Valley Stream, NY, for defendant-appellee-cross-appellant Prime Automotive Parts Co., Inc.

Lloyd M. Bleecker, Bleecker & Associates, Massapequa, NY, for defendant-appellee-cross-appellant Woodbury Automotive Warehouse Enterprises, Inc.

David B. Bernfeld, Mark W. Geisler, Hoffinger, Friedland, Dobrish, Bernfeld, & Stern, New York City, for defendant-appellee-cross-appellant Motor Age, Inc.

Before: WALKER, JACOBS, and LEVAL, Circuit Judges.

WALKER, Circuit Judge:

Plaintiffs K.M.B. Warehouse Distributors, Inc. and KMB/CT, Inc. (together "KMB"), distributors of automotive parts, brought this action against Walker Manufacturing Company ("Walker"), a manufacturer of automobile exhaust equipment, and three distributors of Walker equipment. KMB claims that defendants' actions that were taken in order to prevent KMB from becoming a distributor of Walker products constitute a violation of § 1 of the Sherman Antitrust Act, breach of contract, and tortious interference with contractual business relations. Plaintiffs appeal from summary judgment in favor of defendants entered in the United States District Court for the Southern District of New York (Leonard B. Sand, *District Judge*). Defendants cross-appeal from the district court's denial of their motion for sanctions against KMB.

We affirm for the reasons stated below and the grounds set forth in Judge Sand's thoughtful opinion.

## BACKGROUND

KMB is a distributor of automotive repair parts in the New York, New Jersey, and Connecticut "Tri-state" area. As a distributor, KMB sells its products to independent auto-parts stores, also known as "jobbers." Like most distributors, KMB finds it commercially feasible to carry only one line of exhaust equipment. In 1991, KMB carried exhaust equipment made by AP Parts Marketing Company ("AP"). But, because it considered Walker exhaust systems both superior in quality and more popular with jobbers, KMB wanted to replace its AP exhaust line with Walker's.

In July of 1991, KMB first contacted Walker to arrange to carry the Walker line. In the following weeks, the two companies negotiated the details of a changeover to Walker products and scheduled the change for the week of October 20, 1991. By September, however, several Walker distributors—competitors of KMB—got wind of Walker's plan to supply KMB and expressed their strong disapproval. In particular, defendant Prime Automotive Parts ("Prime") met with Walker on September 20, 1991 to discuss rumors of a KMB changeover. Prime complained that KMB offered more frequent deliveries to customers and expressed concern that KMB would take business away from Prime. It warned that an arrangement between KMB and Walker might affect Prime's relationship with the latter and that Prime would "have to see what happens to [its] business and act accordingly." Other distributors voiced similar concerns. Faced with this pressure, in late September Walker put KMB "on hold."

On November 15, 1991, KMB and Walker met to discuss Walker's concerns about the changeover. Possibly in anticipation of litigation, KMB recorded much of the meeting, at which Walker officers Frank Grosser and Thomas Fontana conveyed the complaints they had received from Walker distributors about KMB's sales tactics, specifically KMB's high discounts. Grosser and Fontana described Walker's existing distributors as "a fraternity" and cautioned that "people have to get along, otherwise they'll murder each other." Noting that "there's no formal way to do this because ... it's not legal," Grosser explained to KMB that Walker was "trying to make sure there's a reasonable chance that everybody can survive and make a profit in this market." Walker then told KMB that it would not supply Walker products to KMB.

KMB filed suit in February of 1992. It claimed that Walker's decision not to supply KMB in the face of the pressure exerted by its distributors amounted to an antitrust vio-

lation, as well as state law breach of contract and tortious interference with contract. By May 4, 1992, each defendant had filed a motion for summary judgment. The district court granted defendants' motions in June, 1994 and dismissed the case. Plaintiffs appealed. Defendants cross-appealed from the district court's refusal to award sanctions.

## DISCUSSION

The district court granted summary judgment in defendants' favor after concluding that KMB failed to show that defendants' actions had an anticompetitive effect as required for the antitrust claim. Having dismissed the antitrust claim, the district court concluded that it lacked jurisdiction to entertain KMB's state law claims. We agree with Judge Sand's excellent opinion, *K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.,* No. 92 Civ 1167, 1994 WL 250115 (S.D.N.Y. June 1, 1994), and affirm for the reasons stated therein.

### I. Actual Adverse Effect on Competition

■ Under § 1 of the Sherman Antitrust Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. KMB alleges that defendants violated § 1 by stifling service and price competition in the Tri-state market for exhaust products. We analyze this sort of allegedly anticompetitive practice—a vertical conspiracy that does not involve price-fixing—according to the "rule of reason." *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977). Under this rule, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Id.* at 49, 97 S.Ct. at 2557.

■ Establishing a violation of the rule of reason involves three steps. "[P]laintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market. . . ." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.,* 996 F.2d 537, 543 (2d Cir.), *cert. denied,* —— U.S.

——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). If the plaintiff succeeds, the burden shifts to the defendant to establish the "pro-competitive 'redeeming virtues' " of the action. *Id.* Should the defendant carry this burden, the plaintiff must then show that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition. *Id.; Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1413 (9th Cir.), *cert. denied,* 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).

### A. The Test for Proving Adverse Effect

■ The district court in this case concluded that KMB failed to meet its initial burden of showing an "actual adverse effect on competition as a whole in the relevant market." In order to fulfill this requirement, the plaintiff must show more than just that he was harmed by defendants' conduct. *See Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 133–34 (2d Cir.) (That another customer of the defendant convinced the defendant to cease dealings with plaintiff did not suffice to show anti-competitive effect.), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) ("The antitrust laws ... were enacted for 'the protection of *competition* not *competitors.*' " (citation omitted)). Therefore, that KMB may have lost a potentially lucrative contract with Walker is not sufficient to state a cognizable antitrust claim.

■ To prevail on a § 1 claim, a plaintiff must also show more than just an adverse effect on competition among different sellers of the same product ("intrabrand" competition), in this case Walker exhaust equipment. *See Borger v. Yamaha Int'l Corp.,* 625 F.2d 390, 397 (2d Cir.1980) (reversible error to instruct the jury to find defendant liable "solely on the basis of a purpose to restrict intrabrand competition, without any finding of either a purpose or effect related to interbrand competition"). Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality

of a product. *See Continental T.V.*, 433 U.S. at 54–55 & n. 23, 97 S.Ct. at 2559–60 & n. 23; *Eiberger v. Sony Corp. of Am.*, 622 F.2d 1068, 1075–76 (2d Cir.1980). Because the focus of our inquiry is the relevant market as a whole, restriction of intrabrand competition must be balanced against any increases in interbrand competition. *Eiberger*, 622 F.2d at 1076; *Copy–Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 411 (2d Cir.1981). The overarching standard is whether defendants' actions "diminish overall competition, and hence consumer welfare." *Graphic Prods. Distribs. v. Itek Corp.*, 717 F.2d 1560, 1571, 1573 (11th Cir.1983).

### B. *KMB's Evidence of Adverse Effect*

■ We agree with the district court that KMB has failed to satisfy the adverse-effect requirement. As Judge Sand noted, KMB cannot show that "the impact on intrabrand competition was anything but *de minimis.*" KMB's proof on this point consists almost entirely of affidavits from twelve of its current customers stating that they prefer both Walker products and KMB's superior service. Such isolated statements of preference are not a sufficient "empirical demonstration concerning the [adverse] effect of the [defendants'] arrangement on price or quality," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 n. 49, 104 S.Ct. 1551, 1567 n. 49, 80 L.Ed.2d 2 (1984), to state a § 1 claim. *See id.* at 30, 104 S.Ct. at 1567 (finding inadequate evidence of an actual adverse effect on competition even though "[t]he evidence indicates that some surgeons and patients preferred respondent's [anesthesiology] services").

In fact, an examination of the intrabrand market belies even KMB's assertion that intrabrand competition has been harmed. There are over twenty Walker distributors of various size in the Tri-state area. All the evidence suggests that there is a highly competitive intrabrand market in Walker products; in fact, during the pendency of this case, prices for Walker products have apparently fallen and distributors' discounts have increased. The fact that KMB was not permitted to compete in this market does not alone prove an adverse effect on intrabrand

competition. *See Capital Imaging*, 996 F.2d at 546 (§ 1 claim fails where plaintiff conceded that price would stay the same were it allowed to enter the market); *Balaklaw v. Lovell*, 14 F.3d 793, 798–99 (2d Cir.1994) (finding plaintiff's claim insufficient because, "[f]rom the consumers' point of view, nothing about the market ha[d] changed" even though plaintiff was not permitted to compete).

Moreover, and critical to our decision, KMB has offered no evidence of an adverse effect on the whole Tri-state interbrand exhaust-product market. The only clear effect of defendants' alleged conspiracy was to prevent KMB from carrying Walker products. After it learned that it could not join the ranks of Walker distributors, KMB continued to compete with that group by offering AP exhaust products to jobbers. KMB was able to do so—rather successfully, in fact—by offering superior pricing and service to counteract what it considers the higher quality of Walker parts. In this very tangible sense, defendants' refusal to allow KMB to change over to Walker products tended to promote rather than curtail interbrand competition. KMB has thus failed to come forward with any evidence that defendants' actions adversely affected service, quality, or price market-wide.

### C. *Market Power as a Proxy for Adverse Effect*

■ KMB argues that, even if it cannot show an actual adverse effect on competition, it can meet its initial burden under § 1 simply by showing that defendants possess sufficient market power to cause an adverse effect on competition. It then challenges the district court's conclusion that KMB's showing of Walker's market power was insufficient to survive summary judgment. We conclude that the showing of Walker's market power was insufficient in this case to satisfy KMB's burden of establishing an adverse effect on the market as a whole.

The proper role of market power in the § 1 rule of reason analysis has been characterized differently by the various circuits. Some courts require that a plaintiff always show the defendant's market power in order

to state a § 1 claim. *See, e.g., Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 221 (D.C.Cir.1986) (suggesting that a showing of market power is a strict prerequisite to recovery in all § 1 cases), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 596 (7th Cir.1984) (making such a showing a prerequisite to recovery); *Graphic Products,* 717 F.2d at 1568. The reasoning underlying this requirement is that unless a firm has "the ability to raise unilaterally prices and profitably maintain those prices above competitive levels and/or restrict output in the market," *State of New York by Abrams v. Anheuser–Busch, Inc.,* 811 F.Supp. 848, 871 (E.D.N.Y.1993), anticompetitive behavior will merely put the firm at a competitive disadvantage in the market as a whole and will not harm consumer welfare. *Capital Imaging,* 996 F.2d at 546.

■ This court has not made a showing of market power a prerequisite for recovery in all § 1 cases. If a plaintiff can show an actual adverse effect on competition, such as reduced output, *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 2018–19, 90 L.Ed.2d 445 (1986), we do not require a further showing of market power. *Capital Imaging,* 996 F.2d at 546. However, "where the plaintiff is unable to demonstrate such actual effects"—as KMB is unable to do here—"it must at least establish that defendants possess the requisite market power" and thus the capacity to inhibit competition market-wide. *Capital Imaging,* 996 F.2d at 546.

■ Market power has been defined as "the ability to raise price significantly above the competitive level without losing all of one's business." *Graphic Prods.,* 717 F.2d at 1570; *see also Broadway Delivery Corp. v. United Parcel Serv.,* 651 F.2d 122, 126–27 (2d Cir.) (defining the market power as "the power to control prices or exclude competition" in the context of a monopolization claim under § 2 of the Sherman Act), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Market power may be shown by evidence of "specific conduct indicating the defendant's power to control prices or ex-

clude competition." *Id.* at 130. In addition, market share may be used as a proxy for market power. *See id.; Graphic Prods.,* 717 F.2d at 1570.

The district court held that KMB failed to establish Walker's market power. KMB did not introduce any direct evidence of Walker's ability to affect prices in the aftermarket for automotive exhaust products. As to market share, KMB submitted evidence that Walker's national market share is approximately sixty percent. Its only evidence of area market share, however, consisted of answers from two deposed Walker employees agreeing that Walker's share of the area market is probably "in line" with its share of the national market.

■ We need not decide whether such assertions as to a defendant's share of the relevant market create a genuine issue of material fact sufficient to survive summary judgment. Even if market power were shown, it would not satisfy the adverse-effect requirement under these circumstances. When we said in *Capital Imaging* that a plaintiff wishing to show adverse effect through indirect means "must *at least* establish that defendants possess the requisite market power," *Capital Imaging,* 996 F.2d at 546 (emphasis added), we meant that a showing of market power, while necessary to show adverse effect indirectly, is not sufficient. There must be other grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherent anticompetitive nature of defendant's behavior or the structure of the interbrand market. *See Graphic Prods.,* 717 F.2d at 1573 (In order to show adverse impact indirectly, a plaintiff must show defendant's market power, that intrabrand competition was impeded, and that "the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price, and hence of consumer welfare."); *cf.* 8 Philip Areeda, Antitrust Law ¶ 1600d, at 10 (1986) ("The large market share of a dominant manufacturer does not itself make his restraint on intrabrand competition unreasonable."). This position is consistent with the approach of courts that require a showing of market power, but only as one of

several steps necessary to establish adverse effect. *See, e.g., Davis–Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1202 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984).

Here, KMB has not offered adequate reasons why we should infer an adverse effect on competition simply from Walker's alleged market power. KMB has not shown that defendants' actions have had a detrimental effect even on intrabrand competition. To the contrary, the evidence suggests that intrabrand competition is healthy and that interbrand competition is even healthier. We therefore conclude that, despite its efforts to prove Walker's market power, KMB has failed to show an adverse effect on competition as a whole.

### D. *Defendants' Anticompetitive Intent*

■ KMB also contends that it has met the adverse-effect requirement by producing evidence of defendants' anticompetitive intent. Intent is relevant to the reasonableness inquiry, but only to "help courts interpret the effects" of defendants' actions. *Anheuser–Busch,* 811 F.Supp. at 874. Like market power, anticompetitive intent is not by itself sufficient to meet the adverse-effect requirement. *See Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918) (noting that intent is relevant in the antitrust context, but "not because a good intention will save an otherwise objectionable regulation *or the reverse*" (emphasis added)); *cf. Capital Imaging,* 996 F.2d at 543 (citing *id.*). Without some evidence of an adverse impact on competition in either the interbrand or intrabrand market, the fact that customers induce a seller to refrain from dealing with another potential customer in order to limit competition does not satisfy a plaintiff's initial burden under § 1. *See Oreck,* 579 F.2d at 133–34 (Plaintiff failed to show anticompetitive effect even though plaintiff's competitor convinced defendant to stop selling to plaintiff.). KMB's evidence of defendants' intent, even belief that what they were doing might be unlawful, is unavailing in the absence of evidence of anti-competitive effect.

### II. Jurisdiction over KMB's State Law Claims

■ After granting summary judgment in defendants' favor, the district court found no basis for retaining jurisdiction over KMB's state law claims. Accordingly, the district court dismissed the remaining claims without prejudice. KMB notes that the second and third claims involved only KMB, a citizen of New York and Connecticut, and Walker, a citizen of Delaware and Wisconsin, and each involved more than $50,000. Because diversity of citizenship provided an independent basis of jurisdiction over these claims (although not for the other state law claims), KMB contends, the district court erred in dismissing them.

■ KMB may be correct in claiming that, if jurisdiction over the second and third claims had been based upon diversity of citizenship, the district court would have erred in dismissing them. As a general rule, there must be complete diversity of citizenship between all plaintiffs and all defendants named in all claims in order for jurisdiction over any claim to be based upon diversity of citizenship. *See Carden v. Arkoma Assocs.,* 494 U.S. 185, 187, 110 S.Ct. 1015, 1017, 108 L.Ed.2d 157 (1990); *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806). In this case complete diversity between all plaintiffs and all defendants was absent since defendants Prime and Woodbury Automotive Warehouse Enterprises, Inc. ("Woodbury") and plaintiff KMB are all citizens of New York. If, however, an independent basis for jurisdiction over non-diverse defendants exists, such as federal question jurisdiction under 28 U.S.C. § 1331, the district court should not dismiss the claims as to which diversity requirements have been met. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 381, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959). The reasoning behind this exception is that plaintiffs should not be required to bring two suits in federal court solely in order to avoid destroying complete diversity. *See Kauth v. Hartford Ins. Co.,* 852 F.2d 951, 959 (7th Cir.1988).

This case presents a slightly different situation from that in *Romero.* The federal Sherman Act claim did originally provide an

independent basis for jurisdiction over non-diverse defendants Prime and Woodbury. But here, unlike in *Romero,* the district court dismissed that claim when it granted defendants' motions for summary judgment. KMB argues, however, that the claim's initial presence in the complaint provided a basis of jurisdiction over the state law claims involving Prime and Woodbury sufficient to trigger the exception articulated in *Romero,* and that jurisdiction cannot be defeated by the subsequent dismissal of the only basis for federal question jurisdiction. This position has apparently been adopted in the Seventh Circuit. *See Kauth,* 852 F.2d at 958–59 (reversing the dismissal of a claim based upon diversity jurisdiction in similar circumstances even though it affirmed the dismissal of the only claims based upon federal question jurisdiction).

We need not decide this issue in this case since KMB's argument suffers from another flaw. KMB did not actually base jurisdiction over its state law claims against Walker on diversity of citizenship in either its complaint or its argument to the district court. Rather, it premised jurisdiction solely on supplemental jurisdiction under 28 U.S.C. § 1367. Section 1367 explicitly provides that a district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The district court was thus well within its discretion when it dismissed KMB's state law claims.

■ Even though KMB did not raise diversity as a basis for jurisdiction until this appeal, we may consider its argument in order to avoid a miscarriage of justice. *See C.H. Sanders Co. v. BHAP Hous. Dev. Fund Co.,* 903 F.2d 114, 121 (2d Cir.1990); *Republic Nat'l Bank v. Eastern Airlines, Inc.,* 815 F.2d 232, 240 (2d Cir.1987). The district court dismissed KMB's remaining claims without prejudice, and KMB has not advanced any reason why being compelled to refile its second and third claims would cause a miscarriage of justice. Accordingly, we affirm the district court's dismissal of these claims.

## III. Sanctions under Rule 11

■ Defendants cross-appeal, arguing that the district court abused its discretion when it declined to impose sanctions against KMB under Federal Rule of Civil Procedure 11. A district court's decision whether to impose sanctions should only be reversed for abuse of discretion. *Rodick v. City of Schenectady,* 1 F.3d 1341, 1350 (2d Cir.1993). Sanctions should only be imposed if "it is patently clear that a claim has absolutely no chance of success," and all doubts should be resolved in favor of the signing attorney. *Id.* (quotation omitted) (reversing a district court's imposition of sanctions). We are not persuaded that KMB's arguments were so completely lacking in merit as to warrant sanctions, and we therefore affirm the district court's decision not to impose sanctions.

## CONCLUSION

For the reasons stated above and in the opinion of Judge Sand, we affirm the judgment of the district court.