**SAGE REALTY CORPORATION, 7 Third Avenue Leasehold LLC, 4 Third Avenue Leasehold LLC, 767 Third Avenue Associates, Madison Avenue Leasehold LLC, 320 West 13th St. LLC and Water Street Leasehold LLC, Plaintiffs,**

v.

**ISS CLEANING SERVICES GROUP, INC. and Realty Advisory Board on Labor Relations, Inc., Defendants.**

No. 96 Civ. 0581.

United States District Court, S.D. New York.

Aug. 2, 1996.

---

**3.** We reiterate that we are speaking of *assumed* conduct which to date has not been alleged, let alone proved.

Winston & Strawn by Daniel R. Murdock, Anthony DiSarro, Elyse Pepper, Adam Schlatner, New York City, for Plaintiffs.

Cahill Gordon & Reindel by Thomas J. Kavaler, Dean Ringel, Christopher Nelson, Jonathan Sherman, New York City, for Defendant ISS Cleaning Services Group, Inc.

Proskauer Rose Goetz & Mendelsohn L.L.P. by Richard A. Levin, Martha E. Gifford, Stephen L. Weinstein, New York City, for Defendant Realty Advisory Board on Labor Relations, Inc.

## OPINION

CHIN, District Judge.

In this case, the owners of six commercial buildings and their managing agent seek relief for alleged antitrust violations that occurred during the January 1996 strike by office building maintenance employees in New York City. Plaintiffs contend that defendants engaged in a group boycott that blocked union members from returning to work on a limited basis for certain large, well-known cleaning service contractors. In turn, plaintiffs were prohibited from employing those union members through the established cleaning service contractors.

Defendants move to dismiss the complaint, contending that plaintiffs cannot state an antitrust claim for two reasons: first, plaintiffs have failed to allege that defendants' conduct caused a cognizable antitrust injury, and second, the non-statutory labor exemption bars plaintiffs' antitrust claim. For the reasons set forth below, I agree. Because plaintiffs fail to sufficiently allege facts demonstrating antitrust injury and because defendants' conduct is protected from the antitrust laws by the non-statutory labor exemption, defendants' motion is granted and the complaint is dismissed.

## BACKGROUND [1]

### I. *The Parties*

The labor dispute that erupted in December 1995 and January 1996 involved

---

1. On this motion pursuant to Fed.R.Civ.P. 12(b)(6), all factual allegations in the complaint are assumed to be true. *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993), *cert. de-*

several key parties. The union representing the cleaning service workers was Local 32B–32J of the Service Employers International Union of the AFL–CIO (the "Union"). The Union's primary negotiations were with defendant Realty Advisory Board on Labor Relations, Inc. (the "RAB"), a multi-employer bargaining organization consisting of owners and managers of nearly 1,000 New York commercial buildings. The Union also negotiated with the Service Employers Association (the "SEA"), a trade association of nineteen of the largest cleaning service contractors in New York. Defendant ISS Cleaning Services Group, Inc. ("ISS") is a well-known cleaning service contractor and a member of the SEA. The six plaintiff building companies are non-RAB members and thus are considered independent buildings ("Independent Buildings"). Plaintiff Sage Realty Corporation ("Sage") is the managing agent for the six plaintiff buildings and is not a member of the RAB.[2]

## II. *The Office Building Cleaning Industry*

Office building maintenance workers in New York are primarily employed by two types of entities: a RAB-member building or a cleaning service contractor. The RAB, which was formed in 1938 as a multi-employer association through which employers in the building service industry could bargain with the Union, currently has approximately 1000 members who control about 65% of the office buildings in New York. Since its formation, the RAB has negotiated numerous collective bargaining agreements on behalf of its members with the Union. Approximately one-quarter of the Union members who work in RAB-member buildings are employed directly by the RAB-member.

The remaining Union members who work in RAB-member buildings are employed by cleaning service contractors, most of which belong to the SEA. The SEA was formed over thirty years ago as a multi-employer association and currently has nineteen members. Until 1993, the SEA entered into collective bargaining agreements on behalf of its members with the Union. Since that time,

however, the SEA has negotiated a pattern collective bargaining agreement, and subsequently each member enters its own agreement with the Union.

Finally, in some limited circumstances, the Union directly enters into contracts with Independent Buildings. In general, however, Independent Buildings obtain cleaning services by hiring a cleaning service contractor. Some cleaning service contractors, such as ISS, provide services for both RAB buildings and Independent Buildings.

## III. *The Strike*

On December 31, 1995, the Union's existing collective bargaining agreements and contracts expired. On January 4, 1996, after several days of fruitless negotiations, the Union went on strike. Both RAB buildings and Independent Buildings were affected.

In order for the cleaning service contractors to continue servicing their customers, they began using non-Union labor. As a result, the Union sent representatives to picket those buildings where non-Union personnel were being employed. Disturbances resulted and the police were summoned on several occasions. The business of some commercial building tenants was also occasionally disrupted because delivery services would not cross the picket lines.

## IV. *The Union's Effort to Settle the Strike with Independent Buildings*

Attempting to settle the strike with Independent Buildings while it continued to negotiate with the RAB, the Union offered to enter into so-called "you too" agreements with various cleaning service contractors. Each "you too" agreement provided for modest wage and benefit increases to workers and a cessation of the strike at the building covered by the agreement. More importantly, the "you too" agreement also included a "most favored nations" clause. This clause provided that:

> In the event the Union negotiates an industry wide commercial building agree-

*nied,* —— U.S. ——, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994).

**2.** For the purposes of this Opinion, I will hereafter refer to the plaintiffs collectively as Sage.

ment with the RAB with terms and conditions more favorable than those provisions provided herein the Union agrees to grant the Employer the more favorable terms and conditions of said settlement.

In other words, by signing the "you too" agreement, the cleaning service contractor would be able to settle with the Union, and resume employing Union members, at no risk of getting a worse deal than the RAB received after it settled with the Union. At the same time, a number of Union members would be able to return to work.

## V. *The Purported Group Boycott*

Although the Union was able to enter into "you too" agreements with many Independent Buildings, it was unable to enter into such agreements with those Independent Buildings, such as Sage, that employ cleaning service contractors who also work for RAB members. According to Sage, ISS and other cleaning service contractors were prepared to enter into "you too" agreements to service Independent Buildings with Union laborers during the strike until RAB issued a "threat." RAB allegedly informed ISS and other cleaning service contractors that if they entered into "you too" agreements to service Independent Buildings, they would no longer be permitted to service RAB buildings. After receiving this "threat," ISS and other cleaning service contractors refused to enter into "you too" agreements.

Sage alleges that ISS's refusal to enter into "you too" agreements resulted from an agreement between RAB and cleaning service contractors that constituted a group boycott in restraint of trade. One of the purposes of this boycott was to ensure that Union employees could not return to work at Independent Buildings during the strike. Also, defendants allegedly "knew that Sage's continued relationship with ISS was important to Sage and that, as a result of ISS's refusal to sign the [you too] Agreements, Sage would be unable to obtain the services

of ISS unless Sage was willing to accept ISS's use of non-Union work." (Cmplt. ¶ 30).

## VI. *Sage's Reaction to the Boycott and Its Purported Injuries*

The effect of this alleged illegal combination and conspiracy was to harm Sage by restraining trade in two relevant markets: (1) the market for cleaning service contractors and (2) the market for managers and owners of commercial buildings. Specifically, as a result of the group boycott, Sage was unable to employ skilled, Union workers through large, well-known cleaning service contractors such as ISS. Instead, Sage was forced to make a choice—accept ISS's use of non-Union workers and face Union picketing or hire Union workers through a lesser known contractor.

Sage chose the latter option. It fired ISS and retained SPC Services, Inc. ("SPC"), which was willing to sign a "you too" agreement with the Union. SPC in turn retained Harvard Maintenance, Inc., a smaller and less prestigious cleaning service company, to service Sage's properties. In light of these agreements, the Union allowed its members to return to work as employees of Harvard and to service Sage's buildings. These workers were the very same people who had serviced Sage's buildings before the strike.

Sage then commenced this action seeking injunctive and monetary relief. In addition to asserting claims under § 1 of the Sherman Act, Sage asserted three state law claims: a claim under the Donnelly Act and two claims for tortious interference with contract. Defendants immediately moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, primarily arguing that Sage fails to allege any antitrust injury and that Sage's antitrust claims are barred by the non-statutory labor exemption to the antitrust laws.[3]

---

**3.** Originally, this action was filed in tandem with a similar action brought by the Union. Both actions were filed while the strike was ongoing. Immediately after defendants moved to dismiss both complaints, the strike was settled. As a result, the Union voluntarily withdrew its action. Sage, however, did not withdraw the present action, maintaining that it was still entitled to injunctive and monetary relief.

## DISCUSSION

### I. Standards for Motion to Dismiss

■ In analyzing defendants' motion to dismiss for failure to state a claim, I must view the amended complaint in the light most favorable to Sage and accept all allegations contained therein as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Annis v. County of Westchester,* 36 F.3d 251, 253 (2d Cir. 1994). Dismissal of the complaint under Fed.R.Civ.P. 12(b)(6) is inappropriate unless it appears beyond doubt that Sage can prove no set of facts that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Christ Gatzonis Elec. Contractor, Inc. v. New York City School Constr. Auth.,* 23 F.3d 636, 639 (2d Cir.1994).

■ Nevertheless, an antitrust complaint is insufficient if it simply contains "conclusory allegations which merely recite the litany of antitrust...." *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991). Instead, an antitrust complaint must "adequately ... define the relevant product market, ... allege antitrust injury, [and] ... allege conduct in violation of the antitrust laws." *Re–Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993).

### II. Antitrust Injury

■ As a prerequisite to recovery for an antitrust violation, a plaintiff must allege an "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *see also Balaklaw v. Lovell,* 14 F.3d 793, 797 (2d Cir.1994); *Volmar Distributors, Inc. v. New York Post Co.,* 825 F.Supp. 1153, 1159 (S.D.N.Y.1993). This requirement, which applies to actions seeking injunctive relief as well as damages, *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427

(1986), stems from the fundamental principle that "[t]he antitrust laws ... were enacted for 'the protection of *competition,* not competitors.'" *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697 (*quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). As the Supreme Court noted in defining antitrust injury:

> Conduct in violation of the antitrust law may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.

*Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 343–44, 110 S.Ct. 1884, 1894, 109 L.Ed.2d 333 (1990). Thus, to satisfy the antitrust injury requirement, a plaintiff must show that "the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

■ Despite this well established law, Sage contends that it need not allege antitrust injury because defendants purportedly engaged in a *per se* violation of the Sherman Act—a group boycott. Sage is incorrect. A party asserting an antitrust claim must always allege antitrust injury, even if it charges that defendants' conduct amounts to a *per se* violation of the Sherman Act.[4] *Balaklaw,* 14 F.3d at 800; *Volmar Distributors,* 825 F.Supp. at 1159. Indeed, the need to show antitrust injury "is at least as great under the *per se* rule as under the rule of reason." *Atlantic Richfield,* 495 U.S. at 344, 110 S.Ct. at 1894.

■ Turning to Sage's complaint, Sage contends that defendants' purported anti-

---

**4.** Consequently, for the purposes of this motion I need not decide whether defendants' alleged conduct indeed constitutes a *per se* violation, as plaintiffs allege.

trust violations caused antitrust injury in two relevant markets. First, Sage was purportedly injured as a consumer in the market for office cleaning contractors. Specifically, Sage alleges that it was forced "to choose between retaining ISS or another major cleaning contractor using non-unionized labor or [using Union labor through] a smaller, less prestigious cleaning contractor." (Cmplt. ¶ 33; see also ¶ 2). Thus, Sage was "deprived of the opportunity to retain the services of a cleaning contractor of its own choosing and one with the staffing, name recognition, relationship, financial resources and administrative capabilities, that Sage's existing tenants and prospective tenants desire." (Cmplt. ¶ 45). Second, Sage was allegedly injured as a competitor in the market for commercial office space in Manhattan, because the ability to hire Union workers from large cleaning service contractors is "critical" to its ability to maintain its existing tenants and to attract new tenants. (Cmplt. ¶ 13). Even assuming, however, that RAB's actions in blocking the Union from entering "you too" agreements constituted a group boycott in violation of antitrust laws, these purported consequences of the strike simply do not constitute antitrust injury.

As to the first claim of injury, Sage fails to allege adequately an *antitrust* injury, that is, a competition-reducing injury, for consumers in the market for cleaning service contractors. Nowhere in its complaint does Sage allege that it, or any other such consumers, received inferior services, was charged higher prices, or suffered any other anti-competitive effect from defendants' actions. More importantly, Sage also fails to allege that the market for cleaning services suffered as a result of defendants' actions. *See Capital Imaging*, 996 F.2d at 543. Instead, Sage merely complains that it could not obtain *both* Union labor and a prestigious cleaning service contractor. In short, it wanted to proceed with business as usual as if the strike had never happened. Such a desire does not amount to antitrust injury.

[10] Sage argues that it could not enjoy the competitive advantages of labor peace during the strike. The antitrust laws, however, cannot be used as a sword to guarantee the perfect operation of markets during periods of labor strife. Sage undoubtedly would have enjoyed better service from cleaning service contractors had there not been a strike. What Sage must show, however, is that some action of the defendants harmed the market for cleaning service contractors. Thus, contrary to Sage's contention, the mere fact that it could not enjoy the competitive advantages of labor peace is not, in and of itself, an antitrust injury.

To properly allege an antitrust injury in the market for cleaning service contractors, Sage must be able to prove some facts showing a competition-reducing injury as a result of defendants' actions. *See Atlantic Richfield*, 495 U.S. at 344, 110 S.Ct. at 1894–95; *Capital Imaging*, 996 F.2d at 543. Not only has Sage failed to make any such allegations, it was in fact able to employ the very same Union employees who worked for it before the strike; it simply did not hire these employees through ISS, but through a smaller company, Harvard, rather than through ISS.[5] Thus, not only was competition in the cleaning service contractor market not reduced, it was increased. *See Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (no antitrust violation where defendant preserved competition by allowing competitors to stay in business). Therefore, under the set of facts contained in Sage's complaint, Sage cannot show antitrust injury in the market for cleaning service contractors.

As to the second claim of injury, Sage's claim that defendants' conduct unreasonably restrained the market for commercial real estate fails to contain any allegation of an antitrust injury. Sage's complaint does explain that RAB members compete with Independent Buildings for commercial tenants based on, among other things, the quality of services provided. (Cmplt. ¶ 11). The complaint further explains that tenants in Sage's buildings include "Fortune 500 compa-

---

5. Because of Harvard's limited financial resources, Sage had to advance funding of Harvard's payroll. There is no further description of this financial arrangement in the complaint. This allegation alone does not constitute antitrust injury.

nies" who find larger cleaning contractors more attractive. (Cmplt. ¶ 13). Finally, Sage alleges that "[t]he retention of ISS or other major cleaning contractors employing Union members ... is critical to [its] ability to satisfy its existing tenants and to attract new tenants to its Buildings." (Cmplt. ¶ 43). None of these statements describes an antitrust injury.

Again, an antitrust injury occurs when a plaintiff's alleged loss stems from an anti-competitive aspect or effect of defendant's behavior. *Atlantic Richfield*, 495 U.S. at 344, 110 S.Ct. at 1894–95; *see also Blaine v. Meineke Discount Muffler Shops, Inc.*, 670 F.Supp. 1107, 1112 (D.Conn.1987) ("[P]laintiffs must demonstrate that defendants' conduct was intended to or did have some anti-competitive effect beyond their own loss of business or the market's loss of a competitor."). Here, an antitrust injury in the market for commercial real estate would have occurred if RAB's improper actions prohibited its competitors, such as Sage, from functioning in the market. Thus, allegations that Sage could have made evidencing an antitrust injury include the loss of tenants, the inability to attract new tenants, or even the receipt of tenant complaints. Sage could also have alleged that a fundamental change in the market for commercial real estate prohibited it from competing with RAB.

Instead, Sage simply states that the use of Union labor from large cleaning contractors is "critical" to maintaining its position in the market. This may be true—yet, Sage does not allege that its tenants in fact reacted or even threatened to react to the initial lack of Union employee or the later lack of a large cleaning contractor. Although Sage may sense that a potential injury may occur in the future, "from the consumers' point of view, nothing about the market has changed" as a result of defendants' conduct. *Balaklaw*, 14 F.3d at 798; *see also K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.*, 61 F.3d 123, 128 (2d Cir.1995) (Sherman Act claim dismissed where plaintiff could not show adverse effect on intrabrand or interbrand competition, even though plaintiff was not permitted to compete in market). Simply put, Sage's inability to obtain Union labor from a large cleaning services contractor during the pendency of the strike—which affected commercial office buildings throughout New York City—did not cause an injury cognizable under the antitrust laws.

### III. *Non–Statutory Labor Exemption*

Sage's complaint must fail for the independent reason that the non-statutory labor exemption to the antitrust laws bars its claim.

The non-statutory labor exemption to the antitrust laws is by now a firmly established, judicially created rule. *Brown v. Pro Football, Inc.*, —— U.S. ——, ——, 116 S.Ct. 2116, 2119–20, 135 L.Ed.2d 521 (1996). This exemption was derived from federal labor statutes to facilitate the collective bargaining process and to remove from the antitrust context questions more appropriately considered by the National Labor Relations Board and under the labor law. *See id.* at —— ——, 116 S.Ct. at 2119–23; *see also In re Detroit Auto Dealers Ass'n, Inc.*, 955 F.2d 457, 461 (6th Cir.) ("the purpose of the non-statutory labor exemption is to advance policies and objectives of the labor laws including 'association of employees to eliminate competition over wages and working conditions' ") (*quoting Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975)), *cert. denied*, 506 U.S. 973, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992).

In practice, the non-statutory labor exemption allows participants in the collective bargaining process to act jointly when bargaining with a common union without facing antitrust liability for any joint agreements they may reach. *Caldwell v. American Basketball Ass'n, Inc.*, 66 F.3d 523, 528 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996); *National Basketball Ass'n v. Williams*, 45 F.3d 684, 688 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996). The exemption applies both to agreements among employee groups, such as unions, and to agreements among employers, such as in a multi-employer bargaining process. *Brown*, —— U.S. at ——, 116 S.Ct. at 2123–24; *Williams*, 45 F.3d at 688. Furthermore, the exemption allows participants to agree on

tactics during the course of the collective bargaining process. *See Brown,* —— U.S. at ——, 116 S.Ct. at 2125–26.

█ Applying these principles to the facts alleged in Sage's complaint, I hold that defendants' purportedly illegal conduct falls within the non-statutory labor exemption to the antitrust laws. In substance, Sage contends that RAB coerced various cleaning service contractors, including ISS, to agree not to enter "you too" arrangements. Sage alleges that this agreement constitutes a group boycott in violation of the antitrust laws. I disagree.

RAB's decision to force [6] cleaning service contractors to refrain from entering "you too" agreements was nothing more than a strategic decision that arose from the collective bargaining process. There is nothing in Sage's complaint to suggest that this agreement was directed at Sage or other Independent Building managers. Indeed, Sage's complaint does not allege that RAB prevented cleaning service contractors from entering "you too" agreements to gain a competitive advantage over Independent Buildings. Sage's complaint merely states that "defendants knew that Sage's continued relationship with ISS was important to Sage and that, as a result of ISS's refusal to sign the [you too] Agreements, Sage would be unable to obtain the services of ISS unless Sage was willing to accept ISS's use of non-Union workers." (Cmplt. ¶ 30).

This allegation, even if true, does not support Sage's claim. Plainly, RAB "knew" that Sage would have to use non-Union workers to service its buildings—its objective was to prevent Union workers from returning to work on a limited basis at unilaterally established wage and benefit levels. What is important is that Sage's complaint does not contain an allegation that the purported group boycott had anything to do with Sage or the other Independent Buildings.

Sage asserts that the challenged conduct cannot be characterized as a concerted position taken during the course of legitimate negotiations with the Union. This assertion, however, is "premised upon an unreasonable characterization of the facts." *Amalgamated Meat Cutters & Butchers Workmen of North America v. Wetterau Foods, Inc.,* 597 F.2d 133, 135 (8th Cir.1979). Indeed, Sage recognizes in its complaint that one of the purposes of the alleged boycott was to ensure that Union employees did not return to work at some buildings while negotiations continued with RAB. (Cmplt. ¶ 30). Thus, as Sage must acknowledge, this purported boycott was nothing more than a tactical decision among employers to counter the Union's attempt to gain economic leverage in the contract negotiations with RAB and "had no purpose or effect beyond the scope of the labor dispute." *Wetterau Foods,* 597 F.2d at 135. Such an action among employers falls squarely within the non-statutory labor exemption. *See Brown,* —— U.S. at ——, 116 S.Ct. at 2125–26; *Williams,* 45 F.3d at 690.

Sage does raise one argument that gives me some pause. Unlike other cases involving the non-statutory labor exemption, here, the purportedly injured party, Sage, is not a party to the collective bargaining agreement at issue. *Cf. Brown,* —— U.S. at ——, 116 S.Ct. at 2123–24; *Caldwell,* 66 F.3d at 528; *Williams,* 45 F.3d at 688. Ultimately, however, this distinction does not require a different result.

Although a situation could arise where a competitor would take advantage of a strike to harm its competitors, Sage does not allege such facts here. Even taking the facts contained in Sage's complaint as true, defendants' conduct occurred strictly within the confines of the collective bargaining process. Again, there is no allegation that defendants intended to affect anybody other than the Union with whom they were negotiating. Thus, the fact that the agreement not to enter "you too" agreements had the incidental effect of affecting Sage, which was not a party to the collective bargaining negotiations, cannot take the act outside of the non-statutory labor exemption.[7] *Cf. Connell,* 421

---

**6.** Of course, neither RAB nor ISS concedes that RAB forced cleaning service contractors to enter this agreement. Yet I must accept the allegations in Sage's complaint as true.

**7.** Of course, this argument also assumes that defendants' actions had some anti-competitive effect on the market, which, as discussed above, they did not.

U.S. at 622–26, 95 S.Ct. at 1835–37 (exemption inapplicable where union's actions were intended to coerce "stranger" employer—not a party to collective bargaining agreement—to agree not to use non-union subcontractors). In short, the alleged group boycott was nothing more than a legitimate part of the collective bargaining process. Accordingly, the non-statutory labor exemption protects RAB and ISS from antitrust liability.

### IV. *State Law Claims*

Sage's state law claims are also dismissed under the well-settled rule that if all of a plaintiff's federal claims have been dismissed prior to trial, remaining state law claims may also be dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted and the complaint is hereby dismissed in its entirety.

SO ORDERED.