**In re NINE WEST SHOES AN-TITRUST LITIGATION.**

**No. 99 Civ. 0245 BDP Lead \*.**

United States District Court,
S.D. New York.

Jan. 7, 2000.

---

\* This opinion pertains to 99 Civ. 0252, 0270, 0303, 0394, 0407, 0426, 0435, 0494, 0535, 0537, 0595, 0596, 0641, 0741, 0763, 0764, 0765, 0766, 0770, 0790, 0899, 0965, 1169, 1617, 2333, 3018, 3191, 3721, 10248, (all BDP).

Robert A. Wallner and Joseph Opper (argued), Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Joshua N. Rubin, Abbey, Gardy & Squitieri, LLP, New York City, Daniel A. Small and Mary N. Strimel, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., Bernard Persky and Barbara J. Hart, Goodkind Labaton Rudoff & Sucharow LLP, New York City and William J. Ban, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for Plaintiffs.

Robert J. Dwyer, Elizabeth A. Bousquette, Bryan Cave LLP, New York City, Richard B. Brualdi, New York City, James N. Benedict, Almee H. Goldstein, Rogers & Wells, New York City, for defendant Nine West Group, Inc.

M. Norman Goldberger, Joel M. Sweet, Wolf Block Schorr & Solis Cohen LLP, Philadelphia, PA, for defendant Bon Ton.

Marvin R. Lange, Shaw Pittman Potts & Trowbridge, New York City, for defendant May Department Stores Co.

Scott A. Martin, Weil Gotshal & Manages, New York City, for defendant Dayton Hudson Corp.

William V. O'Rielly, Phillip A. Proger, Jones Day Reavis & Pogue, Washington, DC, for defendant Federated Department Stores.

Richard Taffet, Golenbock Eiseman Assor & Bell, New York City, for defendant Nordstrom.

Fred T. Isquith, Wolf Haldenstein Adler Freeman & Herz, for defendant.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr., District Judge.

This is a civil antitrust class action brought under the Clayton Act, 15 U.S.C. §§ 15, et seq., seeking relief on behalf of consumers who purchased shoes made and distributed by Nine West Group, Inc. ("Nine West"). The complaint alleges a vertical and horizontal price-fixing conspiracy in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Before this Court is defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity. *See* Fed.R.Civ.P. 12(b)(6) and 9(b).

### BACKGROUND

In deciding a motion under Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and construe those allegations in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir.1991). The following facts are construed accordingly.

This action consolidates some twenty-five class actions filed against Nine West and various retailers. Plaintiffs are individuals suing on behalf of themselves and other consumers who purchased Nine West shoes after January 1, 1988. Defendants are Nine West, a manufacturer and retailer of women's shoes, and ten department store chains[1] that sell Nine West

---

1. The department store defendants are Federated Department Stores, Inc., Dayton Hudson Corporation, Dillards, Inc., The May Department Stores Company, Lord and Taylor, Nordstrom, Inc., Macy's East, Inc., Macy's

shoes[2] to the public. Plaintiffs contend that Nine West engaged in a horizontal and vertical price-fixing conspiracy with the department store defendants and other unnamed co-conspirators to fix the minimum prices of Nine West shoes in violation of § 1 of the Sherman Act.

Beginning in 1988, plaintiffs contend that representatives of the Department Store defendants and Nine West meet regularly at semi-annual trade shows to set the minimum retail prices on various styles for the upcoming season, to determine which Nine West styles would be sold to the public at a discount during the season, and on which dates these events would occur.

Plaintiffs allege that defendants created what they termed "Off–Limits Lists" which included the minimum prices on dozens of styles of Nine West Shoes and contained various restrictions on sale of the shoes including "breakdates," "promotional windows," "minimum prices," and "promotional prices." The "breakdates" referred to the date when certain shoes first could be sold regularly at a discount by the defendants. The "promotional windows" were the specific dates on which shoes could be sold at reduced prices, and what those prices should be. For all other shoes not on the "Off–Limits Lists," defendants agreed not to sell below the "keystone" price, an industry term meaning twice the wholesale cost.

Plaintiffs allege that defendants' conspiracy operated horizontally and vertically. Count I of the complaint accuses defendants of horizontal price-fixing which resulted from agreements between Nine West and its direct competitors, the Department Store defendants. Count II alleges vertical price-fixing between the Department Store defendants and Nine West, as their supplier of Nine West shoes.

According to the complaint, defendants enforced their agreement on prices against other Nine West retailers "through a far-ranging system of policing and coercion." Complaint ¶ 78. Plaintiffs allege a system involving monitoring prices to ensure compliance, and threats by Nine West to cut off or delay shipments to any store that did not adhere to the agreed upon prices. Plaintiffs claim that other Nine West retailers who complied with these prices became willing or unwilling co-conspirators.

Plaintiffs assert that as a result of defendants' conspiracy, "(a) prices charged for Nine West Shoes sold to Plaintiffs and the Class have been raised, fixed or stabilized at artificially high and non-competitive levels; (b) Plaintiffs and other members of the Class have been deprived of the benefits of free, open and unrestricted competition in the purchase of Nine West Shoes; and (c) competition in sale of Nine West Shoes has been unlawfully restrained, suppressed and eliminated." Complaint ¶¶ 89 & 94. The complaint alleges that members of the class have suffered "injury to their business and their property." *Id.* Specifically, plaintiffs claim they have paid "excessive, non-competitive prices for Nine West shoes as a direct result of defendants' price-fixing." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 3.

This motion challenges the sufficiency of the complaint. Defendants argue that it should be dismissed because (1) plaintiffs have not pled antitrust injury, (2) the complaint fails to plead facts sufficient to put the individual defendants on notice of the fraud and conspiracy claims against each of them, and (3) plaintiffs' claims are limited by the four-year statute of limitations.

---

West, Inc., The Bon Ton Stores, Inc., and Bloomingdale's, Inc.

**2.** Nine West's shoe brands include Nine West, Enzo Angiolini, Easy Spirit, Evan Picone, Selby, Pappagallo, Bandolino, Amalfi, 9 & Co., NW, Joyce, Capezio, Banister, Calvin Klein, Luca B. for Calico, The Shoe Studio Group Limited and Westies. All shoes made by Nine West are collectively referred to herein as "Nine West shoes."

For the reasons set forth below, the motion to dismiss is denied.

## *DISCUSSION*

### 1. *Standard on a Motion to Dismiss*

Dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6) is permitted " 'only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief.' " *Scotto v. Almenas,* 143 F.3d 105, 109–10 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Still v. De-Buono,* 101 F.3d 888, 891 (2d Cir.1996). A district court's function on a motion to dismiss under Rule 12(b)(6) is to assess the legal feasibility of the challenged claims. *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998); *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991). The issue "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683.

In antitrust cases in particular, " 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Hospital Building Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). Nonetheless, " '[i]t is not … proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.' " *Id.* (quoting *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

An antitrust complaint must " 'adequately … define the relevant product market, … allege antitrust injury, [and] … allege conduct in violation of the antitrust laws.' " *Rock TV Entertainment, Inc. v. Time Warner, Inc.,* No. 97 Civ. 0161(LMM), 1998 WL 37498, at *2 (S.D.N.Y. Jan. 30 1998) (quoting *Sage Realty Corp. v. ISS Cleaning Services Group, Inc.,* 936 F.Supp. 130, 135 (S.D.N.Y.1996)). The burden on a plaintiff alleging federal antitrust violations, however, is no greater than the burden imposed on other claimants under the Federal Rules of Civil Procedure. *Gross v. New Balance Athletic Shoe, Inc.,* 955 F.Supp. 242, 244 (S.D.N.Y. 1997). Our Circuit has stated that "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977). *Compare, e.g., Newburger, Loeb & Co. v. Gross,* 365 F.Supp. 1364, 1367–68 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds,* 563 F.2d 1057 (2d Cir.1977) ("skeletal" allegations sufficient), *with, e.g., Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972) ("a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal.").

### 2. *Federal Antitrust Laws*

Section 1 of the Sherman Act provides in relevant part that subject to certain limitations "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. § 1. Section 4 of the Clayton Act allows private enforcement of the antitrust laws and broadly defines the class of persons who may maintain a private damage action.[3] *Associated General Contractors*

---

**3.** Other Sections of the Clayton Act relevant to this action include 15 U.S.C. §§ 22 and 26. Section 22 provides:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases

*of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) [hereinafter *"AGCC"*]. The statute provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.

■ In light of the statute's broad language, additional analysis is required to determine whether or not a particular private plaintiff is a proper party to bring a private antitrust action. *AGCC*, 459 U.S. at 534 & n. 31, 103 S.Ct. 897. The Supreme Court has identified several factors to consider in determining whether a particular plaintiff has "antitrust standing." *Id.* at 537–44, 103 S.Ct. 897. They include: (1) the causal connection between an antitrust violation and the alleged harm suffered by the plaintiff; (2) the nature of plaintiff's antitrust injury; (3) the directness or indirectness of the asserted injury; (4) the existence of an identifiable class of persons other than plaintiff who were more direct victims of the antitrust violation, and (5) the potential for duplicative recovery or complex apportionment of damages. *Id.* at 537–44, 103 S.Ct. 897; *Balaklaw v. Lovell*, 14 F.3d 793, 797 n. 9 (2d Cir.1994); *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 296–97 (2d Cir.1983) (discussing factors); *Gross*, 955 F.Supp. at 245 (listing five factors).

Our Circuit has defined the standing inquiry as a "two-pronged analysis" in which "courts must [first] determine whether the plaintiff suffered an antitrust injury." *Balaklaw*, 14 F.3d at 797 n. 9. The Court continued:

If the answer to that question is yes, they must then determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws.

*Id.; see also Korshin v. Benedictine Hospital*, 34 F.Supp.2d 133, 140 (N.D.N.Y. 1999) (stating that "consumers ... and the government would be more 'efficient enforcers' of the antitrust laws because they have stronger interests in ensuring that prices, services, quantity and quality remain at competitive levels.").

Under these analyses, plaintiffs here have standing. As discussed further below, they have alleged that defendants' conduct violated the antitrust laws and that they were directly injured by that conduct when they purchased shoes at prices allegedly inflated by price-fixing.

3. *Antitrust Injury*

■ A private plaintiff seeking to state a claim under Section 1 of the Sherman Act must allege that she has suffered "antitrust injury." *George Haug*, 148 F.3d at 139. This standard does not arise from the text of the Sherman Act; rather, it is separately imposed by Sections 4 and 16 of the Clayton Act, which confer antitrust standing on private plaintiffs. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) [hereinafter *ARCO* ]; *Cargill Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–10, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Balaklaw*, 14 F.3d 793. The injury must be " 'of the type the antitrust laws were intended to prevent and that flows

may be served in the district of which it is an inhabitant, or wherever it may be found.
15 U.S.C. § 26 provides:
Any person, firm, corporation, or association shall be entitled to sue for and have

injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws....

from that which makes defendants' acts unlawful.'" *ARCO*, 495 U.S. at 334, 110 S.Ct. 1884 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

These principles apply where the private plaintiffs are consumers. *See, e.g., Rozema v. The Marshfield Clinic*, 977 F.Supp. 1362, 1374 (W.D.Wis.1997) (class of buyers of physician services alleging *per se* claim of conspiracy to allocate market share under § 1 must plead antitrust injury); *Simpson v. U.S. West Communications, Inc.*, 957 F.Supp. 201, 205 (D.Or.1997) (class of telephone customers alleging monopolization and attempted monopolization in violation of § 2 of the Sherman Act must plead antitrust injury).

The Supreme Court has stated that consumers may suffer a particular kind of antitrust injury. "[A] consumer not engaged in a 'business' enterprise, but rather acquiring goods or services for personal use, is injured in 'property' when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (class of hearing aid purchasers who sued five hearing aid manufacturers alleging vertical and horizontal price fixing had standing to seek treble damages under § 4 of the Clayton Act). "A consumer whose money has been diminished by reason of an antitrust violation has been injured 'in his ... property' within the meaning of § 4." *Id.*

Further, a primary goal of the antitrust laws is the protection of consumers. *See Brunswick*, 429 U.S. at 485 n. 10, 97 S.Ct. 690 (examining legislative history of Sherman Act). In *ARCO* the Supreme Court noted that "consumers ... may bring suit" against unlawful price ceilings. 495 U.S. at 345, 110 S.Ct. 1884; *see also* Jonathan M. Jacobson & Tracy Greer, *Twenty-One Years of Antitrust Injury: Down the Alley with Brunswick v. Pueblo Bowl-O-Mat*, 66 Antitrust L.J. 273, 286 (1998) ("Many ... decisions have confirmed that the primary objective of antitrust is to protect consumers—to prevent firms from engaging in conduct that causes harm by increasing prices, reducing output, or diminishing consumer choice.").

### 4. *Market Power & Per Se Violations of the Antitrust Laws*

■ Defendants contend that, even if plaintiffs paid higher prices than they would have paid absent the illegal conspiracy, they did not suffer antitrust injury because Nine West's 20% share of the overall market for women's shoes is insufficiently large and plaintiffs could have bought other shoes in the remaining 80% of the market not subject to the conspiracy. Plaintiffs, on the other hand, argue that they are not required to make such a showing of market power[4] because their claims are the result of a *per se* violation of the antitrust laws. Market power, they assert, is irrelevant here because their

---

4. Market power is the ability to raise prices above those that would be charged in a competitive market. *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n. 46, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *see also Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 100–01 (2d Cir.1998); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995) ("Market power has been defined as the ability to raise price [sic.] significantly

above the competitive level without losing all of one's business," and it "may be shown by evidence of specific conduct indicating the defendant's power to control prices or exclude competition.") (internal quotations omitted). Market share may be used as a proxy for market power. *K.M.B.*, 61 F.3d at 129. In addition, market share may be used as a proxy for adverse effect on the market as a whole, provided a plaintiff shows both market power "plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Tops Markets*, 142 F.3d at 97.

claims involve a "naked restraint" on price and/or output. Plaintiffs allege it is not necessary under such circumstances for the antitrust defendant to possess "market power" or to be a monopolist for a *prima facie* Sherman Act violation to be alleged or established.

It is crucial here to distinguish between a *per se* violation of the antitrust laws and antitrust injury. As our Circuit has stated, "proof of a *per se* violation and of antitrust injury are distinct matters that must be shown independently." *ARCO*, 495 U.S. at 344, 110 S.Ct. 1884. In their complaint, plaintiffs sufficiently have alleged both.

■ *Per se* violations of the Sherman Act include that " 'limited class of cases where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination.' " *Balaklaw*, 14 F.3d at 800 n. 14 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir.1993)). While the *per se* rules are the product of judicial interpretations of the Sherman Act, they have the "same force and effect as any other statutory commands." *Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 433, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990). Further, "[t]he *per se* rules reflect a longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.' " *Id.* (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). "[T]he rationale for *per se* rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct." *Id.* at 433 n. 15, 110 S.Ct. 768 (internal quotations omitted); *see also ARCO*, 495 U.S. at 342, 110 S.Ct. 1884.

■ A vertical minimum price-fixing scheme is unlawful *per se* under § 1 of the Sherman Act. *See State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 283, 139 L.Ed.2d 199 (1997) (affirming vertical minimum price-fixing schemes as illegal *per se* ); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 249 (E.D.N.Y.1998); *Konik v. Champlain Valley Physicians Hosp. Medical Center*, 561 F.Supp. 700, 715 (N.D.N.Y.1983).

■ Likewise, horizontal price-fixing is considered a *per se* violation of the antitrust laws because "[e]very such horizontal arrangement among competitors poses some threat to the free market." *FTC*, 493 U.S. at 434, 423, 110 S.Ct. 768 ("The horizontal arrangement among these competitors was unquestionably a 'naked restraint' on price and output."). *See also United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 225, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are [ ] banned because of their actual or potential threat to the central nervous system of the economy."); *Balaklaw*, 14 F.3d at 800 n. 14.

As previously noted, plaintiffs here allege both horizontal and vertical price-fixing arrangements. They allege that in a minimum price-fixing case, the "consumer's payment of an artificially high price is itself the antitrust injury redressable under the antitrust law." Plaintiff's Memo at 10. Plaintiffs assert that the cases relied on by defendants, by contrast, generally involve vertical agreements by competitors to fix maximum resale prices which, apart from any harm to specific plaintiffs, may have enhanced overall competition by offering goods to consumers at artificially low prices.

■ Case law teaches that consumers are not required to prove market power in

cases involving *per se* violations of the antitrust laws. The Supreme Court has noted:

> As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output. To the contrary, when there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement..... We have never required proof of market power in such a case.

*National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 109–10, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (internal quotations omitted); *see also FTC,* 493 U.S. at 423, 110 S.Ct. 768.[5]

■ Regardless of whether a claim is based on a *per se* violation, a plaintiff still must plead antitrust injury. *ARCO,* 495 U.S. at 341, 110 S.Ct. 1884 ("We reject respondent's suggestion that no antitrust injury need be shown where a *per se* violation is involved."). "The per se rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act." *Id.* at 342, 110 S.Ct. 1884; *see also Balaklaw,* 14 F.3d at 800; *Sage Realty Corp. v. ISS, Cleaning Services Group, Inc.,* 936 F.Supp. 130, 135 (S.D.N.Y.1996) (the need to show antitrust injury is at least as great under *per se* rule as under rule of reason); *Indiana Gro-*

*cery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989).

Defendants rely primarily on *ARCO, George Haug* and other cases which hold that because conduct found to violate the *per se* rule could, in a given case, be neutral or even beneficial to competition, a private plaintiff must further allege that its injury is tied to a "competition-reducing aspect or effect of the defendant's behavior." *ARCO* at 343, 110 S.Ct. 1884. Defendants note that to be "competition-reducing," our Circuit has instructed that the conduct must have "an actual adverse effect on competition as a whole." *George Haug,* 148 F.3d at 139.

The cases relied on by defendants are inapposite. In *ARCO,* plaintiff USA Petroleum Company alleged a vertical, maximum price-fixing agreement between the Atlantic Richfield Company and its dealers, with whom plaintiff directly competed. The result of the alleged conspiracy was that gas prices were maintained at below market levels. The Court held that plaintiff had not suffered antitrust injury because the maximum price-fixing scheme resulted in nonpredatory prices. 495 U.S. at 339, 110 S.Ct. 1884. The plaintiff in *ARCO* could not recover because as a competitor, it potentially could have benefitted from the alleged maximum-price agreement. *See id.* at 336–37, 110 S.Ct. 1884. Similarly, in *George Haug* a Rolls Royce parts and service dealer sued a competitor for, *inter alia,* conspiring with Rolls Royce to drive plaintiff out of business, to restrain trade and to form a monopoly. 148

---

5. The Tenth Circuit has addressed this question in the context of a private class action in which college coaches alleged that the NCAA and its members had conspired to fix the coaches' salaries at non-competitively low rates:

> The NCAA argues that the district court erred by failing to define the relevant market and by failing to find that the NCAA possesses market power in that market. The NCAA urges that the relevant market in this case is the entire market for men's basketball coaching services, ... and it presented evidence demonstrating that posi-

tions as restricted-earnings basketball coaches make up, at most, 8% of the market.

> The NCAA misapprehends the purpose of market definition, which is not an end unto itself but rather exists to illuminate a practice's effect on competition ... [W]here a practice had obvious anticompetitive effects—as does price-fixing—there is no need to prove that the defendant possesses market power.

*Law v. National Collegiate Athletic Ass'n,* 134 F.3d 1010, 1019–20 (10th Cir.1998).

F.3d at 138. Our Circuit upheld the district court's dismissal of the complaint for failure sufficiently to allege antitrust injury where plaintiff failed to plead its own market share for the servicing of Rolls Royce cars or the market share absorbed by the defendant competitor as a result of plaintiffs' elimination from the market. *Id.* at 140. Here, plaintiffs are consumers of Nine West's products—not its competitors.

A more instructive case is *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), in which the Supreme Court analyzed the consumer antitrust injury that plaintiffs allege they suffered here. The Supreme Court upheld a district court's refusal to dismiss an antitrust class action brought on behalf of purchasers of hearings aids manufactured by five corporations. Plaintiffs in *Reiter* alleged vertical and horizontal price-fixing by defendants which forced them "to pay illegally fixed higher prices for the hearing aids and related services they purchased from respondents' retail dealers." 442 U.S. at 335, 99 S.Ct. 2326. Plaintiffs sought Treble damages and injunctive relief under §§ 4 and 16 of the Clayton Act. The Court adopted an expansive interpretation of the phrase in § 4, "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." The Court noted:

> Congress must have intended to exclude some class of injuries by the phrase "business or property." But it taxes the ordinary meaning of common terms to argue, as respondents do, that a consumer's monetary injury arising directly out of a retail purchase is not comprehended by the natural and usual meaning of the phrase "business or property." We simply give the word "property" the independent significance to which it is entitled in this context. A consumer whose money has been diminished by reason of an antitrust violation has been

injured "in his ... property" within the meaning of § 4 of the Clayton Act.

*Id.* at 339, 99 S.Ct. 2326.

Plaintiffs complaint is sufficient to survive defendants' motion to dismiss. Plaintiffs allege that the harm to competition here is that Nine West and several department stores agreed among themselves as to the prices of Nine West shoes as opposed to allowing competition to determine prices, resulting in excessive pricing of Nine West shoes. *See FTC*, 493 U.S. at 423, 110 S.Ct. 768 ("[T]he Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."). The factual allegation of injury appears in ¶ 81 of the Complaint, which alleges that "as a result of the conspiracy" plaintiffs have paid higher prices "than they would have paid in the absence of the conspiracy." Defendants conduct "reduced overall competition" in the market and caused plaintiffs' "injury to their business and property." Complaint ¶ 89. Given the standards this Court must adhere to on a motion to dismiss, the plaintiffs sufficiently have alleged legally cognizable injury resulting from the defendants' alleged competition-reducing conduct.

### 5. *Conspiracy Claim*

Defendants argue that plaintiffs' complaint should be dismissed because it lacks specificity and thus fails to put defendants sufficiently on notice of the claims against them. They assert that plaintiffs must detail the conduct of each defendant in participating in the conspiracy, including information on which stores participated in which meetings in furtherance of the conspiracy.

To state a claim under section 1 of the Sherman Act, a plaintiff must allege: (1) concerted action, (2) by two or more persons that (3) unreasonably restrains trade. *See Capital Imaging Associations, P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126

L.Ed.2d 337 (1993); *Brenner v. World Boxing Council*, 675 F.2d 445, 451 (2d Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *Mover's & Warehousemen's Ass'n of Greater New York, Inc. v. Long Island Moving & Storage Ass'n, Inc.*, No. 98 Civ. 5373(SJ), 1999 WL 1243054, at *3 (E.D.N.Y. Dec. 16, 1999); *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 58 F.Supp.2d 228, 238 (S.D.N.Y. 1999); *Continental Orthopedic Appliances, Inc. v. Health Insurance Plan of Greater New York, Inc.*, 994 F.Supp. 133, 138 (S.D.N.Y.1998); *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F.Supp. 703, 710 (S.D.N.Y.1995). The complaint "must identify the co-conspirators, and describe the nature and effects of the alleged conspiracy." *Continental Orthopedic*, 994 F.Supp. at 138 (quoting *International Television Productions Ltd. v. Twentieth Century–Fox Television Division*, 622 F.Supp. 1532, 1537 (S.D.N.Y.1985)). To measure the sufficiency of the plaintiffs' claim, the Court must determine whether the complaint "contains either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.; see also Brenner*, 675 F.2d at 451 ("Concerted action need not be proved directly, but can be based upon circumstantial evidence; for example, from inferences drawn from the words and ·conduct of the parties to the agreement and from their course of dealing").

▮ Plaintiffs have satisfied all three elements. Plaintiffs here have alleged that Nine West and at least 10 department stores agreed among themselves to fix prices of Nine West shoes. The complaint gives some detail about how this conspiracy operated by alleging, *inter alia*, when and where defendants conducted their conspiratorial meetings and how prices were set and suggests how defendants monitored and enforced their conspiracy. They allege that this conspiracy restrained trade by reducing competition and forcing consumers to pay artificially inflated prices.

Furthermore, relevant information regarding the conduct of particular defendants is " 'largely in the hands of the alleged conspirators.' " *Gross*, 955 F.Supp. at 247 (quoting *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)). Consumer antitrust plaintiffs like those here have less ability to determine the details of this alleged conspiracy than would competitors. *See id.*

### 6. *Statute of Limitations*

Defendants argue that plaintiffs' action should be limited to claims arising after January 15, 1995, consistent with the four-year statute of limitations governing antitrust claims. They assert that plaintiffs' allegations fail to satisfy the heightened pleading requirements of Fed.R.Civ.P. 9(b), which provides in relevant part: "Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs assert that claims dating back to January 1, 1988 are not time-barred because the statute of limitations was tolled under the doctrine of fraudulent concealment.

▮ Under § 4B of the Clayton Act, a four-year statute of limitations governs private civil antitrust actions seeking treble damages. 15 U.S.C. § 15b; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988). An antitrust action accrues and the statute of limitations begins to run when the defendant commits an act that injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 832 (2d Cir. 1991). An overt act committed more than four years prior to the filing of the complaint whose effects were first felt outside the limitations period, therefore, usually will not support a cause of action even if the effects persist into the limitations peri-

od. *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423, 1440–41 (S.D.N.Y. 1986). Exceptions exist for damages that would have been too speculative to recover at the time plaintiff filed suit, and for damages resulting from an act outside the four year period whose effects first were felt within the statutory period. *Higgins,* 942 F.2d at 832.

In the context of a continuing antitrust conspiracy, such as the price-fixing scheme alleged in this action, the general limitations rule "has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* (quoting *Zenith,* 401 U.S. at 338, 91 S.Ct. 795). The Supreme Court has explained further that in the case of a price-fixing conspiracy that "brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr,* 521 U.S. at 189, 117 S.Ct. 1984 (internal quotations omitted). But the commission of a "separate new overt act" will not permit the plaintiff to recover for the injury caused by old overt acts that do not fall within the limitations period. *Id.*

### a. Fraudulent Concealment

■ The statute of limitations for an antitrust violation is tolled if plaintiff can show fraudulent concealment. *Id.; Hendrickson Bros.,* 840 F.2d at 1083; *Donahue,* 633 F.Supp. at 1440. "[T]he purpose of the fraudulent-concealment doctrine is to prevent a defendant from 'concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'" *Hendrickson Bros.,* 840 F.2d

at 1083 (quoting *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874)).

■ In order to show fraudulent concealment, an antitrust plaintiff must prove (1) that the defendant concealed the existence of the antitrust violation, (2) that plaintiff remained in ignorance of the violation until sometime within the four-year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence. *In re Merrill Lynch Limited Partnerships Litig.,* 154 F.3d 56, 60 (2d Cir.1998); *Hendrickson Bros.,* 840 F.2d at 1083; *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 519 (S.D.N.Y.1996); *Donahue,* 633 F.Supp. at 1443. "The burden rests squarely on the party pleading fraudulent concealment, and courts require particularity in pleading fraudulent concealment." *Donahue,* 633 F.Supp. at 1443. Defendants contest the adequacy of plaintiffs' pleading with respect to elements one and three of the *Hendrickson* test.

Circuits have adopted different standards of proof required to show fraudulent concealment. *See, e.g., King & King Enters. v. Champlin Petroleum Co.,* 657 F.2d 1147, 1156 (10th Cir.1981) (fraudulent concealment toll applies where the "defendant actively sought to conceal its price-fixing activities, and the defendant's conduct, by reason of its fraudulent nature, was inherently self-concealing."). *State of West Virginia ex rel. McGraw v. Meadow Gold Dairies, Inc.,* 875 F.Supp. 340, 343 (W.D.Va.1994) (discussing three different standards). Our Circuit has adopted the more lenient standard requiring plaintiffs to prove concealment by showing either that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing. *Hendrickson,* 840 F.2d at 1083.

In *Hendrickson,* our Circuit addressed the question whether defendants were entitled to either a judgment notwithstanding the verdict or to a new trial on the grounds that the State's claims of conspir-

acy to obtain highway construction contracts and to fix prices were barred by the statute of limitations. The Court of Appeals held that since bid-rigging and price-fixing conspiracies are deemed self-concealing, a plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct. *Id.* at 1083; *see also New York v. Cedar Park Concrete Corp.,* 684 F.Supp. 1229, 1231–32 (S.D.N.Y. 1988).

 Because, unlike in *Hendrickson,* this issue arises in the context of a motion to dismiss, this Court must look only to the allegations contained within the four corners of the complaint. *See Cedar Park Concrete Corp.,* 684 F.Supp. at 1232. Thus, by alleging a price-fixing scheme, the plaintiff sufficiently has alleged the first prong of fraudulent concealment and under *Hendrickson,* there is no need to require the pleading of affirmative actions taken by the defendants to prevent the plaintiff's discovery of its claim. *See id.; Hendrickson,* 840 F.2d at 1083–84.

### B. Due Diligence

 " 'The concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.' " *Klehr,* 521 U.S. at 195, 117 S.Ct. 1984 (quoting II Areeda & Hovenkamp, Antitrust Law § 338, at 152); *see also Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir.1985) ("the statute does not begin to run until the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice."); *Camotex, S.R.L. v. Hunt,* 751 F.Supp. 469, 470 (S.D.N.Y.1990) (same). Plaintiffs must plead due diligence with specificity. *In re Merrill Lynch,* 154 F.3d at 60 (affirming dismissal of complaint where plaintiffs "did not allege . . . that they exercised due diligence; they make no allegation of any specific inquiries of [defendant], let alone detail . . . such inquiries. . . .").

Plaintiffs have sufficiently alleged due diligence. The complaint alleges:

Plaintiffs and the other class members could not have discovered the conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendants, including, but not limited to: (1) the selective use by the Defendants of "promotional windows" to create the false appearance that discounting was occurring through ordinary market forces; and (2) hiding the existence and purpose of the Off Limits Lists from the consuming public.

Complaint ¶ 84.

Plaintiffs filed their complaint on February 18, 1999, within days after the national media reported on allegations of price-fixing by Nine West. Plaintiffs claim that this was the first public disclosure of facts relating to the alleged conspiracy and that prior to the articles, there was insufficient public indication of Nine West's pricing practices to trigger the running of the statute of limitations. *See Camotex,* 751 F.Supp. at 472. As one district court wrote in the context of RICO claims, the question is "whether the plaintiffs received information sufficient to alert a reasonable person to the probability that they had been misled, that is whether the plaintiffs were on inquiry notice; and . . . whether the plaintiffs responded to such notice with reasonable diligence." *Butala v. Agashiwala,* No. 95 Civ. 936(JGK), 1997 WL 79845, at *4 (S.D.N.Y. Feb. 24, 1997). Once plaintiffs were alerted to their potential claims by the media, they promptly filed suit and thus have satisfied the due diligence requirement.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied.

**SO ORDERED.**