**State of CALIFORNIA, ex rel. Bill LOCKYER, Plaintiff,**

v.

**SAFEWAY, INC., dba Vons, a Safeway Company, Albertson's, Inc., Ralphs Grocery Company, a division of the Kroger Company, Food 4 Less Food Company, a division of the Kroger Company, and Does 1 through 100, inclusive, Defendants.**

**No. CV 04–0687 GHK SSX.**

United States District Court, C.D. California.

May 25, 2005.

See, also, 355 F.Supp.2d 1111.

Bill Lockyer, Richard M. Frank, Thomas Greene, Kathleen Foote, Barbara M. Motz, Olivia W. Karlin, Office of the Attorney General, Los Angeles, CA, for Plaintiff, the State of California.

Phillip A. Proger, Jones Day, Washington, D.C., Jeffrey A. LeVee and Amy A. Stathos, Jones Day, Los Angeles, CA, for Defendant, Albertson's Inc.

J. Thomas Rosch and Peter Huston, Latham & Watkins LLP, San Francisco, CA, for Defendant, The Vons Companies, Inc.

Robert B. Pringle and Paul Griffin, Thelen Reid & Preist LLP, San Francisco, CA, for Defendant, Ralphs Grocery Company.

## MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KING, District Judge.

## I

### INTRODUCTION

On February 2, 2004, California Attorney General Bill Lockyer, on behalf of the State of California ("the State"), filed a complaint alleging that defendants Safeway, Inc., d.b.a. Vons, Albertson's, Inc., Ralphs Grocery Company, ("the Supermarkets") and Food 4 Less Food Company ("Food 4 Less") (collectively "Defendants") engaged in an unlawful combination and conspiracy in restraint of interstate trade and commerce in violation of section 1 of the Sherman Act. 15 U.S.C. § 1. The State alleged that Defendants violated antitrust laws by entering into a Mutual Strike Assistance Agreement ("MSAA") whereby they agreed, among other things, to share revenue in the event of a strike. Defendants now move for summary judgment, arguing that their MSAA is immunized from antitrust challenge because it is related to the Supermarkets' participation in multiemployer collective bargaining and thus falls within the nonstatutory labor exemption to the antitrust laws. Having carefully considered all of the parties' briefs, evidence and oral arguments, we rule as follows:

## II

### Summary Judgment Standard

We may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Defendants, having raised the nonstatutory labor exemption as an affirmative defense, bear the burden of proof on this defense at trial. To be entitled to summary judgment, a moving party with the burden of proof at trial "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir.2000) (quoting *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992)). Summary judgment is appropriate when the issue turns only on questions of law, "the resolution of which does not involve disputed material facts." *Applied Med. Res. Corp. v. U.S. Surgical Corp.,* 352 F.Supp.2d 1119, 1123 (C.D.Cal.2005).

## III

### Facts

Virtually all relevant facts are undisputed. Ralphs, Albertson's and Vons, three of the largest supermarket chains in Southern California, joined together in a multiemployer collective bargaining unit to negotiate with certain United Food and Commercial Workers ("UFCW") labor organizations. Their collective bargaining agreement ("CBA") with UFCW was set to expire on October 5, 2003. (Defs.' Ex. H). In anticipation of a labor dispute, the Supermarkets executed a pair of MSAAs on September 5, 2003.[1] (Cox Decl. ¶ 6). Pursuant to the MSAA, the Supermarkets agreed to lock out all union employees within 48 hours in the event any of their stores were to experience a strike. They also agreed to share revenue according to a fixed formula,[2] beginning at "12:01 a.m. on the Monday at the start of the week in which the strike or lockout ... commences and continuing for two ... full weeks following the week in which each strike or lockout ends." (MSAA at ¶ 4(C)). Moreover, the revenue sharing was not limited to the employers participating in the multiemployer bargaining unit. It included Food 4 Less, a chain that was not a signatory to the Ralphs/Vons/Albertson's CBA.

On October 11, 2003, the unions struck local Vons stores. (Cox Decl. ¶ 7). In response, Ralphs and Albertson's locked out their union employees the next day. (Schroeder Decl. ¶ 12; Bohn Decl. ¶ 9). The unions initially picketed all three supermarket chains, but stopped picketing Ralphs stores on October 31, 2003. (Schroeder Decl. ¶ 13). Selective picketing of Vons and Albertson's stores continued until the end of the strike in late February 2004.[3] Ultimately, Ralphs and Food 4 Less paid Vons and Albertson's approximately $142 million in revenue sharing for the strike period, and another $4.2 million for the two-week period following the strike. (Schroeder Decl. ¶ 13).

## IV

### Discussion

The State does not challenge the entirety of the MSAA. Instead, it claims only that the revenue-sharing provision, the inclusion of Food 4 Less, and the so-called two week "tail" provision (the "challenged provisions" or "challenged conduct") vio-

---

**1.** Although there are two separate MSAAs in the record, each covering different labor organizations, they have identical terms. (Pls.' Exs. 16 & 17). We thus refer to them as a single agreement.

**2.** The revenue-sharing formula is set forth at paragraph 6 of the MSAA, and is reproduced

verbatim as Appendix A to this Memorandum and Order.

**3.** The Supermarkets and the unions entered into an agreement to end the strike on February 26, 2004. The unions' members ratified the agreement on February 29, 2004. (Cox Decl. ¶ 7; Schroeder Decl. ¶ 15).

late antitrust laws. Defendants assert, and the State disputes, that all of the challenged provisions are immune from antitrust scrutiny under the nonstatutory labor exemption. Our task on this motion is limited to deciding whether the nonstatutory labor exemption applies to these challenged provisions. If so, the State's antitrust claim necessarily fails. If not, further proceedings will be necessary to determine whether these provisions in fact violate the antitrust laws.

## A

### The Nonstatutory Labor Exemption

 Federal labor statutes set forth a national labor policy favoring collective bargaining, and require good-faith bargaining over wages, hours and working conditions. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996).[4] Moreover, "[m]ultiemployer bargaining itself is a well-established, important, pervasive method of collective bargaining, offering advantages to both management and labor." *Id.* at 240, 116 S.Ct. 2116. This process, however, necessarily entails some amount of restraint on competition. In an attempt to harmonize the Sherman Act with the national labor policy "of promoting 'the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation,'" the Supreme Court recognized a nonstatutory labor exemption to antitrust liability. *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 665, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 211, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)). "[T]he implicit exemption recognizes that, to give effect to federal labor

laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Brown*, 518 U.S. at 237, 116 S.Ct. 2116.

For example, in *Local Union No. 189, Amalgamated Meat Cutters, and Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 679–80, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (plurality opinion) (White, J.), a meat cutters union successfully negotiated a concession from a multiemployer bargaining unit by which the markets agreed that meat would not be sold before 9 a.m. or after 6 p.m. Jewel Tea Company and National Tea Company, two of the employers in the bargaining unit, signed the agreement under duress of a strike vote. Contending that the agreement was illegal, they brought suit under the Sherman Act. *Id.* at 680–81, 85 S.Ct. 1596. Justice White, writing for a plurality, concluded that the agreement was immune from antitrust attack under the nonstatutory labor exemption because national labor policy places beyond reach of the Sherman Act agreements between unions and employers as to "when, as well as how long, employees must work." *Id.* at 691, 85 S.Ct. 1596. Were it otherwise, collective bargaining would be frustrated. *See id.* at 689, 85 S.Ct. 1596; *Connell Constr. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) (stating that "the goals of federal labor law never could be achieved" were it otherwise).

Also, in *Brown*, 518 U.S. at 234, 116 S.Ct. 2116, the Supreme Court considered the exemption in the context of an agreement solely among employers. When

---

4. Throughout this opinion we refer to *Brown v. Pro Football, Inc.* simply as *"Brown."* There is, however, another similarly named, relevant Supreme Court opinion. *See NLRB*

*v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). To distinguish the two, we refer to the latter by its full name (*"NLRB v. Brown "*).

NFL employers reached an impasse with players in negotiations over salaries for a developmental squad, the employers unilaterally implemented the developmental squad program at the salary they had last proposed. *Id.* at 235, 116 S.Ct. 2116. The players alleged the employers' agreement among themselves to implement the wage provisions violated the Sherman Act. *Id.* The Court disagreed, concluding that the exemption applied to the employers' practice of jointly imposing the "last best good-faith wage offer" at an impasse. *Id.* at 250, 116 S.Ct. 2116. It also observed that "[a]s a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable." *Id.* at 237, 116 S.Ct. 2116 (emphasis in original).

However, the exemption has never been regarded as an open-ended invitation to those involved in a labor dispute to restrain competition in the product market. It is a *"limited* nonstatutory exemption from antitrust sanctions." *Connell,* 421 U.S. at 622, 95 S.Ct. 1830 (emphasis added). For example, in *Pennington,* 381 U.S. at 668–69, 85 S.Ct. 1585, the Supreme Court held that the exemption did not protect an agreement between a union and large mine operators that sought to eliminate smaller companies, thereby allowing the larger companies to control the market. Among other things, the agreement forced a particular wage and royalty scale upon the smaller operators. *Id.* at 660, 85 S.Ct. 1585. The Court noted that "there is nothing in the labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire indus-

try. On the contrary, the duty to bargain unit by unit leads to a quite different conclusion." *Id.* at 666, 85 S.Ct. 1585. Moreover, the conduct ran directly counter to policies underlying the antitrust laws. *Id.* at 668, 85 S.Ct. 1585. Thus, in harmonizing the Sherman Act with labor law, there was no basis for applying the limited exemption. *Id.* at 668–69, 85 S.Ct. 1585. "[T]here are limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws." *Id.* at 665, 85 S.Ct. 1585.

Likewise, in *Connell,* 421 U.S. at 619–26, 95 S.Ct. 1830, the Supreme Court considered the scope of the exemption in a case in which a union, through picketing, reached an agreement with general contractors to deal only with subcontractors who were parties to the union's collective bargaining agreement. Although the union's goal was to organize the subcontractors' employees, it eschewed any interest in representing any employees of the general contractors. Thus, the agreement was reached outside of any collective bargaining between the union and the general contractors. The Court concluded that the union's methods were not immune from antitrust attack simply because its goal was legal under labor law. *Id.* at 625, 95 S.Ct. 1830. The agreement imposed on the general contractors caused all non-union subcontractors to become ineligible to compete for available work. Balancing labor policy with the interests protected by the antitrust laws, the Court explained:

This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and

therefore cannot claim a nonstatutory exemption from the antitrust laws.

*Id.*

In all of these decisions, the Supreme Court's focus was on harmonizing labor and antitrust laws by applying the nonstatutory labor exemption where there was an actual or potential conflict between the interests of labor relations and antitrust enforcement. Where no such conflict existed, the Court declined to apply the exemption. As is apparent from the Court's case law, the inquiry is necessarily fact specific and requires application of various considerations that help us discern whether the harmonizing principle is served by applying the exemption to the challenged conduct in a particular case.

■ In deciding that the exemption applied in *Brown,* its most recent opinion on the issue, the Court noted that the "conduct took place during and immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship." *Brown,* 518 U.S. at 250, 116 S.Ct. 2116. While we do not view this statement as declaring rigid factors that must be found

in every case for the exemption to apply,[5] we nevertheless believe that the Court signaled the importance of these considerations in determining whether there is an actual or potential conflict between labor and antitrust laws that requires accommodation through the application of the exemption.

Each of the considerations described in *Brown* relates in some way to the scope of the exemption. While none is controlling, together they provide a valuable analytical tool for us to use in deciding whether the challenged conduct merits application of the exemption in this case.

**B**

***Brown*'s Considerations**

**1. The Timing of the Revenue Sharing Provisions**

■ The first consideration set forth in *Brown* examines whether the timing of the conduct was closely connected to the collective bargaining process. It is undisputed that the Supermarkets' multiemployer bargaining unit, in anticipation of the impending labor dispute, entered into the MSAA on September 5, 2003, one month before the expiration of their CBA. The MSAA's revenue-sharing terms were trig-

---

**5.** Prior to the Supreme Court's decision in *Brown,* the Ninth Circuit used a three-factor test to determine whether this exemption applied. *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n,* 81 F.3d 858, 861 (9th Cir.1996) (applying the exemption when "(1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining, and (3) the agreement is produced from bona fide, arm's-length collective bargaining.") (citing test from *Mackey v. Nat'l Football League,* 543 F.2d 606, 614 (8th Cir.1976)). To the extent that this so-called "*Mackey* test" exempts only agreements between unions and employers, it does not sur-

vive *Brown,* which extended the exemption to an employer-only agreement. *See Clarett v. Nat'l Football League,* 369 F.3d 124, 134 (2d Cir.2004) ("the suggestion that the *Mackey* factors provide the proper guideposts ... simply does not comport with the Supreme Court's most recent treatment of the nonstatutory labor exemption in *Brown* ·....."). Moreover, while the *Mackey* test required all three factors to be present, *Brown* does not adopt such a rigid test. But even if *Phoenix Elec. Co.* were still good law, the challenged provisions would clearly not be exempt from antitrust scrutiny because they do not concern wages, hours or conditions of employment as required by the second factor of the *Mackey* test.

gered by a strike against or lockout by any one of the Supermarkets. (MSAA at ¶ 5(F)). In this way, the timing of the revenue sharing generally fell within the collective bargaining process.

However, the timing analysis is complicated by the fact that the revenue sharing ran for not only the entire duration of the strike, but also two full weeks after the conclusion of the labor dispute. Defendants assert that the "tail" is justified under *Brown* because the Supreme Court applied the exemption to conduct taking place "during and immediately after a collective-bargaining *negotiation*." *Brown*, 518 U.S. at 250, 116 S.Ct. 2116 (emphasis added). However, viewing *Brown* in the context of its facts, it is clear that the time following the breakdown in negotiations between the players and the NFL was itself part of the bargaining process.

During labor negotiations, the National Football League proposed its wage terms for a developmental squad to the players' union in April 1989, which the players rejected. *Id.* at 234, 116 S.Ct. 2116. Two months later, in June, negotiations broke down, and the parties reached an impasse. *Id.* at 235, 116 S.Ct. 2116. The league then unilaterally instituted its proposal. *Id.* But the labor dispute remained very much alive, even though negotiations had ceased. No agreement had yet been reached. The time "immediately after a collective-bargaining negotiation" described by the Supreme Court was still within an *ongoing* labor dispute. In this case, by contrast, the MSAA's two-week tail occurred after the conclusion of the labor dispute.

An impasse in negotiations, like the one in *Brown*, "may occur several times during the course of a single labor dispute, since the bargaining process is not over when the first impasse is reached ...." *Id.* at 246, 116 S.Ct. 2116. Moreover, during such an impasse in negotiations, "[t]he

multiemployer bargaining unit ordinarily remains intact .... The duty to bargain survives; employers must stand ready to resume collective bargaining." *Id.* at 244, 116 S.Ct. 2116. This situation contrasts sharply with the one now before us in which the challenged conduct during the tail period occurred after a new CBA had already been successfully negotiated, and the labor dispute was over.

*Brown* does not provide any basis for applying the exemption to an agreement among employers that persists after a new CBA has been successfully negotiated. In holding that the exemption may not apply to agreements that are "sufficiently distant in time and circumstances from the collective-bargaining process," the Supreme Court pointed to two specific examples illustrating such distance: decertification of a union, and an "extremely long" impasse accompanied by instability or "defunctness" of a multiemployer bargaining unit. *Id.* at 250, 116 S.Ct. 2116. Both examples involve the collapse of collective bargaining in a way that terminates the process. The multiemployer negotiations with the union do not merely cease temporarily under such circumstances; rather, the process is entirely over due to the unraveling of the collective bond holding together the parties on one side of the negotiation. The Court's citation of these examples lends further support to our view that the exemption is ill-suited for actions taken after termination or successful completion of the collective bargaining process.

Defendants argue that the tail serves national labor policy because they can more effectively maintain their unified front in dealing with the unions *during* negotiations if they know they will have some protection from competition *after* a labor dispute and while they await the return of their former customers. Nothing in the record supports Defendants' as-

sertions that the collective bargaining process could not function, or would even be substantially impaired, without this tail provision. The Supermarkets believed that some of their customers were likely to stay away for many months after the strike's conclusion. (Cox Decl. ¶ 8; Schroeder Decl. ¶ 11). Indeed, one of Defendants' witnesses declared that six months after the strike's conclusion, consumers still had not returned to their pre-strike shopping patterns. (Schroeder Decl. ¶ 15). The two-week tail thus did not do away with the economic impact the Supermarkets faced when recovering from the loss of their customers. The fact that they suffered lingering economic impact *despite the tail,* and they nevertheless have a new CBA with the unions in place, illustrates that it was not necessary to the collective bargaining process for the employers to be buffered from the effects of changed shopping patterns. *See Brown,* 518 U.S. at 237–38, 116 S.Ct. 2116.

Once the Supermarkets succeeded in negotiating their agreement with the unions, national labor policy ceased to serve as a justification for the challenged conduct.[6] Their concerns about customers' post-strike shopping preferences are not matters of labor law, but primarily matters of competition. Under national economic policy favoring competition, the problem of regaining customers who stray to competitors is uniquely within each business's own, separate ability to solve. They can devise discounting opportunities, promotions, special services and all manner of creative enticements designed to lure customers back, just as they did to win customers from competitors in the pre-strike period. We are aware of no case that has ever held, or even suggested, that a tail period like that in Defendants' MSAA should fall within the ambit of the nonstatutory labor exemption.

We conclude that the revenue-sharing tail provision was not sufficiently temporally connected to the collective bargaining process to favor application of the exemption because the conduct at issue transpired not merely at an impasse in negotiations, but after the bargaining process itself had concluded successfully. The timing of this conduct weighs against application of the exemption to the tail period.

On the other hand, the timing of the revenue sharing *during* the strike occurred within the context of an ongoing collective bargaining process. Negotiations were still underway during the strike, and no CBA had yet been reached. The timing of this part of the challenged conduct weighs in favor of applying the exemption.

### 2. Connection to Lawful Operation of the Bargaining Process

The next consideration set forth in *Brown* focuses on the nature of the employers' conduct. We examine whether the subject of the employers' agreement was sufficiently connected to the collective bargaining process.

The challenged provisions of the MSAA reallocate revenues among competitors during and after the strike period. The matter thus falls within Congress's core concerns in enacting the Sherman Act. *See Apex Hosiery Co. v. Leader,* 310 U.S. 469, 487–88, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (discussing the kind of restraint at which the Sherman Act is aimed), 492–93 (dis-

---

**6.** By this we do not mean to suggest that national labor policy supports use of a revenue-sharing agreement during a strike. *See* discussion *infra* Part IV.B.2. We simply point out that once the strike is over and a new CBA is agreed upon, there is not even an arguable case for reliance on the collective bargaining process to justify an exemption from the antitrust laws.

cussing antitrust laws being directed at conduct that "suppress[es] ... competition in the marketing of goods and services ....") & 495 n. 16 (discussing the antitrust laws' emphasis on "competitive conditions in the industry."). The revenue-sharing terms of the MSAA implicate labor policy at best *indirectly* by purportedly encouraging the employers to maintain their unity in bargaining; however, they *directly* affect market competition by freezing these competitors' relative market shares [7] at pre-strike levels and redistributing revenue from one competitor to another pursuant to a fixed formula. The potential anticompetitive effects of such conduct do not follow naturally from the elimination of competition over wages, hours and working conditions, *see Connell,* 421 U.S. at 625, 95 S.Ct. 1830, and are not primarily directed at the labor market.[8] Rather, the potential effects of the revenue sharing are directed at Defendants' own competitive relationship with one another and have no direct connection to any term being negotiated with the unions.

Defendants argue that revenue sharing promotes national labor policy because revenue sharing is necessary for them to effectively resist union "whipsawing" (*i.e.,* selective picketing of one employer within a multiemployer bargaining unit in order to sever that employer's economic interest from that of the other employers). Thus, the challenged conduct is necessary to maintain relatively equal bargaining power.

Defendants' argument is based on a faulty premise. While national labor policy encourages collective bargaining, it does not require, imply or ensure that the parties to the bargaining process must have equality of bargaining position at all times. In essence, Defendants argue that in order to allow them to fend off any potential adverse bargaining tactic by the unions, the employers must be able to not only formulate appropriate counter-measures, but also have such measures categorically immunized from antitrust scrutiny. While we do not question that a negotiating party should be able to take appropriate action to respond to opposing tactics, we do not agree that such action should be protected categorically from antitrust scrutiny merely because it is helpful to the negoti-

---

7. We use the phrase "relative market shares" in a very specific sense. Defendants shared revenue based on each chain's individual share of the aggregated, pre-strike sales. While this did not necessarily constitute apportionment of the entire market for groceries in Southern California, by its own terms it sought to maintain each competitor's portion of their aggregated share of that total market.

8. Before *Brown,* courts generally limited the application of the exemption to agreements whose anticompetitive restraints fell primarily and directly on the labor market. *See Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1051 (D.C.Cir.1995), *aff'd* 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) ("[T]he case for applying the exemption is strongest where a restraint on competition operates primarily in the labor market and has no anti-competitive effect on the product market."); *Mid–America Reg'l Bargaining Ass'n v. Will County Carpen-*

*ters District Council,* 675 F.2d 881, 893 (7th Cir.1982) ("Thus, a complaint must allege conduct operating as a direct restraint upon the business market in order to avoid application of the nonstatutory exemption."); *Consol. Express, Inc. v. N.Y. Shipping Ass'n,* 602 F.2d 494, 513 (3rd Cir.1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980) ("The term nonstatutory exemption ... is a shorthand description of an interpretation of the Sherman Act, making that statute inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market."). *Brown* did not negate or implicitly overrule this nexus between exempted conduct and the labor market. *See Connell,* 421 U.S. at 622, 95 S.Ct. 1830 ("[T]he nonstatutory exemption offers no ... protection when a union and a nonlabor party agree to restrain competition in a business market.").

ating position of a party to the bargaining process. National labor policy has never promised parties engaged in collective bargaining that they will be shielded from economic duress during (and after) a labor dispute. In fact, labor law seems to presume that sometimes the playing field may be uneven. *See generally NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 489–90, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). Congress has not conferred upon the National Labor Relations Board ("NLRB") the power to create an " 'ideal' or 'balanced' state of collective bargaining." *Id.* at 499–500, 80 S.Ct. 419. As the Supreme Court long ago recognized, the risk of *some* economic hardship to both sides is built into the collective bargaining process, and that hardship (or, at least the threat of it) is ultimately part of what drives negotiations by bringing both parties to the table to compromise. *See id.* at 489–90, 80 S.Ct. 419. But just because use of or resistance to economic pressure may be permissible under labor law does not mean that the collective bargaining process is itself compromised if any or all such actions are not exempt from antitrust scrutiny.[9]

The methods used in labor negotiations are not immune from antitrust attack simply because the goal is legal. *See Connell*, 421 U.S. at 625, 95 S.Ct. 1830. Here, there is no showing that the Supermarkets and the unions cannot bargain collectively if revenue-sharing provisions like those in the MSAA were subject to antitrust scrutiny.

Defendants also argue there is fundamentally no difference between mutual aid agreements that provide for joint action locking out union employees, or shutting down production, *see, e.g., Clune v. Publishers' Ass'n*, 214 F.Supp. 520, 522 (S.D.N.Y.1963), *aff'd* 314 F.2d 343 (2d Cir. 1963) (per curiam), and mutual aid agreements providing for the sharing of revenue. They go so far as to contend that the revenue-sharing provisions in their MSAA are analytically indistinguishable from lockout agreements as both are defensive tools used to combat whipsawing. Because revenue sharing purportedly keeps the employers' economic interests aligned, Defendants contend that without it, picketed stores would be pressured to accede to the unions' demands through the threat of losing customers who prefer to shop at non-picketed stores. Like a lockout, revenue sharing theoretically strengthens employers' resolve to stand together through the strike. *See Brown*, 518 U.S. at 245, 116 S.Ct. 2116 (discussing *NLRB v. Brown*, 380 U.S. 278, 289, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), in which the Supreme

---

9. Defendants cite two out-of-circuit cases for the proposition that employer revenue-sharing agreements like this one are protected by the nonstatutory labor exemption. In the first, the Second Circuit upheld a joint strike insurance plan against an antitrust challenge. *Kennedy v. Long Island R.R. Co.*, 319 F.2d 366, 374 (2d Cir.1963). However, the applicability of the nonstatutory labor exemption was not before, and was not considered by, the court. The court focused instead upon whether the insurance policy was a substantive violation of the antitrust laws. Of course, whether the challenged MSAA provisions violate the antitrust laws is not before us on this motion. Thus, *Kennedy* offers us no guidance here.

Defendants also rely upon a case in which several airlines joined together in a mutual aid pact. *Air Line Pilots Ass'n Int'l v. Civ. Aeronautics Bd.*, 502 F.2d 453 (D.C.Cir.1974). This case does not assist our inquiry because the court declined to address the antitrust issue due to the plaintiff's failure to exhaust an administrative remedy. *Id.* at 457. Further, *Air Line Pilots* involved an explicit statutory exemption in the Federal Aviation Act, not the implicit nonstatutory exemption now before us. *Id.* at 457 & n. 14 (citing 49 U.S.C. § 1384 (1974), which relieved the potential defendant "from the operation of 'the antitrust laws' " (repealed by the Civil Aeronautics Board Sunset Act of 1984, PL 98–443)).

Court held that hiring replacement workers during a lockout was calculated to "preserv[e] the integrity of the multiemployer bargaining unit."). "Labor law permits employers, after impasse, to engage in considerable joint behavior, including joint lockouts and replacement hiring." *Id.* Defendants also contend that revenue sharing has no more effect on the market than a lockout, which decreases production and thereby affects the availability of goods and services to consumers. For these reasons, Defendants argue that the rationale of the decisions sanctioning other kinds of employer mutual aid pacts, such as lockout agreements, dictates that the nonstatutory labor exemption should apply to Defendants' revenue sharing in this case.

While Defendants' argument may have superficial appeal, a closer examination of the nature of the mutual aid at issue reveals that there are significant differences between a lockout, or a production stoppage, and revenue sharing. Employer lockouts are the flip-side of employee strikes. Congress statutorily recognized the use of lockouts as a lawful economic weapon in labor disputes. *NLRB v. Truck Drivers Local Union No. 449 ("the Buffalo Linen Case")*, 353 U.S. 87, 92–93, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) ("The unqualified use of the term 'lock-out' in several sections of the Taft–Hartley Act is statutory recognition that there are circumstances in which employers may lawfully resort to the lockout as an economic weapon."). The Taft–Hartley Act uses "strike" and "lock-out" jointly, as alternate forms of the same concept (*i.e.*, a work stoppage induced by a labor dispute). *See id.* at 92 n. 16, 77 S.Ct. 643 (citing 29 U.S.C. § 158(d)(4) ("no resort to 'strike or lockout' during 60–day notice period"); 29 U.S.C. § 173(c) ("Director of Mediation Service to seek to induce parties to settle dispute peacefully 'without resort to *strike, lock-out*, or other coercion' ")); 29 U.S.C. § 176 ("appointment of board of inquiry by President when 'threatened or actual *strike or lock-out*' creates a national emergency"); 29 U.S.C. § 178 ("power to enjoin '*strike or lock-out*' in case of national emergency")) (emphasis added). Though the Supreme Court has not expressly passed on whether an "employer lockout is the corollary of the employees' statutory right to strike," *id.* at 93 n. 19, 77 S.Ct. 643, we conclude that it functions as such in light of the statutory linkage of the two. *See id.* at 92 n. 16, 77 S.Ct. 643. The statutory linkage of strikes and lockouts demonstrates that they are two sides of the same coin under national labor policy.

Viewing lockouts as the analog of strikes, we look to the historical relationship between strikes and the Sherman Act to understand why this sort of mutual aid is immune from antitrust review. In 1924, the Supreme Court considered whether a strike against manufacturers gave rise to an antitrust claim against the union or its members. *United Leather Workers' Int'l Union v. Herkert & Meisel Trunk Co.*, 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104 (1924). The employers charged that the union's strike obstructed the manufacture and shipment of goods to be sold in interstate commerce. *Id.* at 462, 44 S.Ct. 623. Chief Justice Taft, writing for the majority, reasoned that the "mere reduction in the supply of an article [in] commerce [through the] prevention of its manufacture is ordinarily an *indirect and remote* obstruction to that commerce." *Id.* at 471, 44 S.Ct. 623 (emphasis added). It only *directly* obstructs commerce when "the necessary effect upon such commerce . . . is to enable those preventing the manufacture to monopolize its supply or control its price, or discriminate as between its would-be purchasers . . . ." *Id.*

Similarly, in *Apex Hosiery*, 310 U.S. at 481–83, 60 S.Ct. 982, a hosiery manufactur-

er sought to recover antitrust damages from a union for losses the manufacturer suffered from a strike at its factory. The Supreme Court recognized that the strike "naturally and inevitably" caused the cessation of production and shipment of goods. *Id.* at 484, 60 S.Ct. 982. However, it questioned whether this was the *kind* of restraint on trade that the Sherman Act sought to prevent. *Id.* at 487, 60 S.Ct. 982. It concluded that the Sherman Act does not police interference with the movement of goods and services. *Id.* at 490, 60 S.Ct. 982. Rather, it polices " 'trusts' and ... 'combinations' of businesses and of capital organized and directed to control of the market by *suppression of competition in the marketing of goods and services* ...." *Id.* at 492–93, 60 S.Ct. 982 (emphasis added). Its emphasis is on "competitive conditions in the industry." *Id.* at 495 n. 16, 60 S.Ct. 982. The Supreme Court reviewed the common law doctrines of restraint, including conduct such as fixing prices, dividing market territories, and restricting production, all of which tend to raise prices and suppress competition. *Id.* at 497, 60 S.Ct. 982. It held that the strike had no effect on prices of hosiery in the market, and did not have as its purpose the restraint of competition. *Id.* at 501, 60 S.Ct. 982. It reasoned that under the Clayton Act, labor is not a commodity or article of commerce, and therefore restraints on the employees' services to the employer are not restraints of trade or commerce. *Id.* at 503, 60 S.Ct. 982.

The same way a strike restrains the employees' provision of services to the employer, a lockout restrains the employers' purchase of those services from the employees. Both are fundamentally restraints on *labor.* Specifically, they are restraints on the labor market governed by a particular CBA. Though such restraints may *indirectly* affect commerce by restricting production or sales of goods or services to consumers, *see United Leather Workers,* 265 U.S. at 471, 44 S.Ct. 623, they are not the *kind* of restraints at which the Sherman Act is aimed. *Apex Hosiery,* 310 U.S. at 487, 60 S.Ct. 982. The work stoppage, whether initiated by the employers in a lockout or by the employees in a strike, does not restrict competition in the market *among competitors in the industry.*

This distinction in the nature of the restraint is illustrated in *Clune,* 214 F.Supp. at 529–31, a case in which all the city newspaper publishers stopped production and thereby ceased "purchasing" the labor of printing pressmen who had targeted some of the newspapers with a strike. Relying on *United Leather Workers,* 265 U.S. at 471, 44 S.Ct. 623, the district court concluded that this production stoppage was analogous to the reduction in the supply of an article in commerce that would result from an employee strike. *See Clune,* 214 F.Supp. at 530–31. The court extended the rationale for exempting strikes from the Sherman Act to the employers' production stoppage. Like a strike or lockout, this production stoppage directly restrained labor, and had an indirect effect on commerce, but "such results [were] not the direct interference with interstate commerce which the Sherman Anti–Trust Act forbids." *Id.* at 529 (quoting *United States v. San Francisco Elec. Contractors Ass'n,* 57 F.Supp. 57, 60–61 (N.D.Cal.1944)).

The foregoing demonstrates why Defendants are mistaken in their contention that the revenue-sharing agreement at issue in this case is analytically indistinguishable from lockouts. While lockouts restrain labor (by halting the employers' purchase of the employees' services), and thereby indirectly affect commerce, the MSAA's revenue-sharing provisions do not affect the availability of labor, but instead guarantee, during (and for two weeks after) the

strike, that each of the Supermarkets will be entitled to its pre-strike percentage share of their aggregate sales. As such the challenged provisions affect primarily matters of competition in the product market. This consideration weighs against applying the exemption to the Supermarkets' challenged conduct.

### 3. Connection to Mandatory Subjects of Negotiations

■ It is undisputed that the revenue-sharing provisions of the MSAA do not concern mandatory subjects of collective bargaining (*i.e.*, wages, hours or working conditions). The lack of any connection to the core activities of collective bargaining weighs against application of the nonstatutory labor exemption to any of the revenue-sharing provisions of the MSAA.

### 4. Effect on Parties Not Involved in the Collective Bargaining

■ The final consideration of the *Brown* analysis focuses on whether the employers' agreement concerned only parties to the collective bargaining relationship. Ralphs, Vons and Albertson's were involved in negotiating a CBA as a single, multiemployer bargaining unit. They were therefore indisputably parties to the collective bargaining process.

Food 4 Less, however, was not part of the Supermarkets' multiemployer bargaining unit. Food 4 Less had its own, separate CBA with the unions which, unlike the Ralphs/Vons/Albertson's CBA that expired on October 5, 2003, did not expire until February 28, 2004, and was subsequently extended to April 4, 2004.[10] Additionally, representatives of the Ralphs/Vons/Albertson's multiemployer bargaining unit would have no role in negotiating Food 4 Less's future CBA with its unions. (MSAA at ¶ 8(D)). Nevertheless, the revenue-sharing provisions of the MSAA obligated Food 4 Less to share its revenue with the Supermarkets in return for an agreement from Vons and Albertson's to do likewise were Food 4 Less to experience a strike in its future labor negotiations.[11] (*See* MSAA at ¶ 8(A)).

The parties have presented conflicting evidence as to the entity status of Food 4 Less.[12] This factual dispute is not material to our inquiry on this motion because our focus here is not on whether the employers' agreement affects independent corporate entities, but rather on whether it affects parties outside the collective bargaining relationship. The existence of a separate Food 4 Less CBA resolves that question. As a matter of *labor* law,

---

**10.** The record contains two separate collective bargaining agreements between Food 4 Less and UFCW locals. (*See* Pl.'s Exs. 2–3). Both agreements ran from February 27, 2000 through February 28, 2004. (*Id.*). As the differences between these two agreements are not salient to the present dispute, we refer to them as a single agreement.

**11.** Food 4 Less never received the benefit of this reciprocal revenue-sharing provision, however, as it was able to avert a strike when negotiating its own CBA. (Supp. Schroeder Decl. ¶¶ 2–5).

**12.** The State proffered the Food 4 Less CBA that was executed by an entity referred to as Food 4 Less of California, Inc. which appears to be a corporate entity distinct from Ralphs. (Pl.'s Exs. 2–3). In fact, Food 4 Less is sometimes treated as a separate entity in The Kroger Company's public filings with the Securities and Exchange Commission, and in the corporate hierarchy. (*See* Pl.'s Exs. 1, 49–51). Defendants submitted evidence demonstrating that Food 4 Less is merely a dba of Ralphs, and "Food 4 Less of California" is a dormant subsidiary whose name was used in error on Food 4 Less's CBA. Defendants also demonstrated that Food 4 Less's administrative structure is closely tied to Ralphs's own operations, and that Food 4 Less had an interest in the Ralphs/Vons/Albertson's CBA because Food 4 Less's own contract would be affected by it. (Schroeder Decl. ¶¶ 3–5, 7, 14; Defs.' Exs. I & J).

the revenue sharing provision involved a party outside the collective bargaining relationship. It is the potential conflict between labor and antitrust laws that is at issue here, not the law of business associations. Food 4 Less (however defined) was not a member of the Ralphs/Vons/Albertson's multiemployer collective bargaining unit.

Defendants also contend that Food 4 Less should not be considered a party outside the Ralphs/Vons/Albertson's multiemployer collective bargaining unit because some of the terms of Food 4 Less's own CBA were tied to terms in Ralphs's contract with the unions. Specifically, Food 4 Less's employees received health and welfare benefits equal to 75 percent of the value of those benefits in Ralphs/Vons/Albertson's CBA. Additionally, Food 4 Less's CBA recognized the experience level obtained by certain classes of workers who had previously worked under the Ralphs/Vons/Albertson's CBA. However, the linkage of Food 4 Less's employees' benefits and service credits to Ralphs's CBA does not make Food 4 Less a "party" to the Ralphs/Vons/Albertson's collective bargaining unit for purposes of the present analysis. This contractual linkage was incidental to the collective bargaining relationship. Indeed, the MSAA itself restricted its members from participating in Food 4 Less's own future negotiations with the unions. (MSAA at ¶ 8(D)) ("[T]he Management Committee will have no direct role with respect to Food4Less' [sic] conduct of its negotiations with the UFCW locals.").

Defendants argue that inclusion of third parties does not weigh against application of the exemption. They rely on *Kennedy*, 319 F.2d at 372–74. As we previously noted,[13] Defendants' reliance on *Kennedy* is misplaced inasmuch as the Second Circuit did not consider the applicability of the nonstatutory labor exemption.

Defendants also rely on *Amalgamated Meat Cutters & Butchers Workmen v. Wetterau Foods, Inc.*, 597 F.2d 133 (8th Cir.1979). There, a wholesale supplier provided a supermarket with temporary replacement workers in order to enable the supermarket to remain open during a strike. The union sued, alleging a violation of the Sherman Act. However, the agreement affected only labor, in the same way that a strike or lockout would. The court in *Wetterau Foods* specifically recognized that "[d]efining the boundaries of [the nonstatutory labor exemption] has not proved an easy task. A court must balance the degree of interference with federal labor policy with the magnitude of the restraint of trade and whether the restraint directly or indirectly affects market prices and free competition for the consuming public." *Id.* at 136.

In analyzing this factor, we note that Food 4 Less's status as a party outside the Ralphs/Vons/Albertson's collective bargaining unit cannot be disconnected from its status as a competitor of the stores within that bargaining unit such as Vons and Albertson's. Unlike the wholesale supplier who was not a competitor of the store engaged in the labor dispute in *Wetterau Foods*, Food 4 Less competes with at least two of the Supermarkets.[14] The

13. *See* discussion *supra* n. 9.

14. Defendants also cite a district court case from the Southern District of New York for the proposition that inclusion of Food 4 Less in the MSAA does not preclude application of the exemption. *See Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc.*, 936 F.Supp. 130, 137–39 (S.D.N.Y.1996). The primary holding

of the case was that the plaintiff suffered no antitrust injury. *Id.* at 136–37. The district court's analysis of the applicability of the exemption sheds no light on the relevant considerations set forth in *Brown*. *See id.* at 137–38. Significantly, it offers no guidance whatsoever on the implications of involvement of a competitor, like Food 4 Less, who is not a member of the multiemployer bargaining

involvement of this competitor who operates under a separate CBA weighs against Defendants. We conclude that this consideration militates against extending the limited nonstatutory labor exemption to this revenue-sharing agreement.

## C.

### Other Considerations

#### 1. Defendants' Proposed Parity Rule

■ At oral argument, Defendants argued that as a matter of parity, as long as an agreement among employers is designed to counter a union tactic protected by the statutory labor exemption, it should receive a corresponding immunity from the nonstatutory exemption. (Reporter's Transcript ("RT") at 34:6–10). Defendants claim that because revenue sharing was a tactic adopted to combat whipsawing, the nonstatutory immunity should apply to the challenged provisions.

Defendants purportedly derive this rule from *Brown*'s statement that the Court's decision "is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not sufficiently interfere with that process." *Brown*, 518 U.S. at 250, 116 S.Ct. 2116. (*See* RT 19:20 (arguing that this language was the controlling portion of *Brown*); RT 24:9–15 (arguing that the "specific issues of bargaining" discussed in the sentence laying out the four considerations do not limit the exemption)). According to Defendants, concerted employer activity that is related to bona fide efforts to counter union labor tactics is sufficiently close in

time and circumstances to the collective bargaining process to warrant application of the exemption.

This argument is flawed for a number of reasons. First, the language Defendants quote from *Brown* is a caveat on the Court's holding, not the holding or its rationale. The structure of the opinion makes clear that timing and circumstance are not the only relevant considerations. Defendants' reading ignores the proper context of the Court's discussion. The Court announced its holding and rationale as follows:

> For these reasons, we hold that the implicit ("nonstatutory") antitrust exemption applies to the employer conduct at issue here. That conduct took place during and immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship.

*Id.* The next sentence, which Defendants cite, set forth a limitation on the holding and its fact-based inquiry: "Our holding is not intended to insulate ... every joint imposition of terms by employers ...." *Id.* Defendants mistake the Court's fact-based limitation of its holding for the holding itself.

By failing to address the full rationale for the holding in *Brown*, Defendants ignore whether the agreement "involve[s] a matter that the parties were required to negotiate collectively" and whether it "concern[s] only the parties to the collective-bargaining relationship," two considerations important to the Court's decision.

---

unit. *See id.* at 138 n. 7 (noting that the defendants' actions had no anticompetitive effect on the market). We do not find *Sage Realty's* analysis of the exemption persuasive

in a situation, like ours, in which the conduct at issue involved an employer who is purportedly a horizontal competitor of the members of the multiemployer bargaining unit.

*Id.* We are not persuaded by any formulation of a test that simply ignores considerations the Supreme Court has deemed relevant.

Second, Defendants' reading of the nonstatutory exemption as requiring a per se parity rule represents a fundamental misunderstanding of the interplay between the statutory and nonstatutory exemptions. The nonstatutory exemption is not a mere equalization of the specific immunities afforded to organized labor by Congress in the Clayton and Norris–LaGuardia Acts, but rather is a judicially-created exemption that is necessary for an entirely different statutory scheme—the National Labor Relations Act ("NLRA")—to function as Congress intended. As the Supreme Court explained:

> The basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris–LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113. These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. They do not exempt concerted action or agreements between unions and nonlabor parties. The Court has recognized, however, that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions.

*Connell,* 421 U.S. at 621–22, 95 S.Ct. 1830 (citations omitted). *See also Brown,* 518 U.S. at 236, 116 S.Ct. 2116 (citing various provisions of the NLRA, 29 U.S.C. §§ 151, 153, 158, as sources of policy that form the basis of the nonstatutory exemption); *Allen Bradley Co. v. Local Union No. 3, IBEW,* 325 U.S. 797, 801–06, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945) (discussing history and purpose of statutory exemption); *United States v. Hutcheson,* 312 U.S. 219, 230–31, 61 S.Ct. 463, 85 L.Ed. 788(1941) (same).

While *Brown* extended the nonstatutory exemption to encompass certain employer-only agreements, it did not fundamentally alter the dynamics of the relationship between the nonstatutory and statutory exemptions. *See Brown,* 518 U.S. at 237–38, 116 S.Ct. 2116 (holding that employers are entitled to the nonstatutory exemption over agreements that are "necessary to make the statutorily authorized collective-bargaining process work as Congress intended."). Therefore, any application of the implicit nonstatutory exemption must be limited to those instances where the exemption is necessary to carry out Congress's intent as expressed in national labor policy. Defendants' interpretation of the exemption impliedly invites us to legislate an extension of the nonstatutory exemption to include a strict rule of parity that Congress has not chosen to embrace. We decline Defendants' invitation.[15]

In conclusion, we find no support for Defendants' proposed rule of parity in the statutory scheme, case law or policy con-

---

**15.** Defendants also imply that because lockouts, which are afforded the nonstatutory immunity, are "responses" to strikes, revenue sharing, which is a "response" to selective picketing, should be similarly immune. The syllogism is false. "Responsiveness" is not the touchstone of the nonstatutory immunity. As we addressed above, *see supra* discussion Part IV.B.2, lockouts warrant immunity because their primary and direct restraint falls on the labor market. The same cannot be said of the revenue sharing scheme in the MSAA.

siderations underlying the labor and antitrust laws. Nor can we discern any rationale for adopting such rule in lieu of weighing the four considerations set forth in *Brown.*

## 2. Defendants' Proposed Reliance on the NLRB

■ Defendants argue that an antitrust court should not police the tactics used in collective bargaining because the NLRB already has authority to review their conduct, and the specter of an antitrust court's additional involvement would impair the functioning of that process. *See Brown,* 518 U.S. at 242, 116 S.Ct. 2116 (noting that the NLRB, rather than antitrust courts, has "primary responsibility for policing the collective-bargaining process."). After oral argument, Defendants filed copies of several recent NLRB letter opinions in which the Board found that an allegedly similar mutual strike assistance agreement used by some of the Supermarkets in a different labor dispute did not violate the NLRA.

This argument misapprehends our role in this action. We do not purport to decide what is appropriate action under labor law. However, Congress has not vested the NLRB with responsibility to enforce the Sherman Act, review anticompetitive effects upon the market, or harmonize the nation's labor laws with the Sherman Act. The NLRB is charged with reviewing different aspects of such conduct. *See Ins. Agents,* 361 U.S. at 498–99, 80 S.Ct. 419 (discussing NLRB's responsibility for reviewing whether parties' conduct evidences a good-faith desire to come to an agreement). Just as the NLRA serves a purpose different from that of the Sherman Act, our role in determining the applicability of the nonstatutory labor exemption is different from the NLRB's inquiry into whether a labor practice is unfair under national labor policy. We thus cannot agree with Defendants that the NLRB's

decision about the permissibility of such conduct as a matter of labor law is a sufficient condition for applying the nonstatutory labor exemption in the face of an antitrust challenge. In fact, Supreme Court precedent is to the contrary. *See Connell,* 421 U.S. at 625, 95 S.Ct. 1830 (holding that a union's conduct was not immune from antitrust sanctions simply because its goal is lawful). *See also* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 256e (2002) ("[M]ere lawfulness under the labor laws is not sufficient to create an antitrust immunity. Labor policy may be indifferent as to certain conduct, and then no labor policy purpose is served by immunizing it if it is anticompetitive.").

## V

## Conclusion

We have considered the harmonizing principle that underlies the nonstatutory labor exemption to the antitrust laws, and have carefully weighed the relevant considerations noted in *Brown.* Overall, the challenged revenue-sharing provision of the MSAA is not sufficiently connected to the subject matter of the collective bargaining process, or to matters required to be negotiated collectively. Defendants' revenue-sharing agreement directly implicates competition among competitors in an industry by redistributing revenue earned at certain companies to others that were less successful during the strike, and by freezing each Defendant's relative market share at pre-strike levels, not only during a strike, but also for at least two weeks after successful completion of the bargaining process. This redistribution of revenue included a competitor that was not part of the multiemployer bargaining unit. The challenged provisions' potential anticompetitive effects do not follow naturally from the collective bargaining process, and they are neither necessary to, nor implied

by, the functioning of that process. As labor law has not been shown to be impaired by subjecting this sort of revenue sharing to antitrust scrutiny, there is no conflict between antitrust and labor laws that requires reconciliation by application of the exemption. We thus hold that the challenged provisions are not protected from potential antitrust liability by the limited nonstatutory labor exemption. The incidental benefits that revenue sharing affords to employers in their labor negotiations "cannot be utilized as a cat's-paw to pull employers' chestnuts out of the antitrust fires." *United States v. Women's Sportswear Mfrs. Ass'n,* 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949) (Jackson, J.).

Alternatively, we hold that the exemption also cannot be applied to this revenue-sharing agreement because of the involvement of Food 4 Less, a competitor that was not part of the multiemployer collective bargaining unit, and the inclusion of the tail period that took the employers' conduct entirely outside the collective bargaining process.

Defendants' motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Appendix A -Paragraph 6 of the MSAA

The revenue-sharing terms of paragraph 6(A) of the MSAA are set forth verbatim in this appendix.

6. CPA CALCULATIONS OF COST-SHARING PAYMENTS. The CPA shall compute the amount of cost-sharing, if any, due to/from each of the employers as set forth below. An example of this calculation is attached hereto as Exhibit A. The computations shall be as follows:

A. Revenue Sharing

(i) For the Pre–Strike Base Period, the CPA will compute each Employer's percentage share ("the Pre-strike Sales Share") of the Employers' combined average weekly sales for stores in the Covered Area.

(ii) For the Strike/Lockout Period, the CPA will compute the dollar amount of increase or decrease in each Employer's average weekly sales as compared to that Employer's average weekly sales in the Pre–Strike Base Period ("Dollar Change in Sales").

(iii) For the Strike/Lockout Period, the CPA will compute the total dollar change in average weekly sales for all Employers ("Total Weekly Sales Lost") by combining each Employer's Dollar Change in Sales.

(iv) The CPA will compute a presumed redistribution of lost sales ("The Dollar Sales Redistribution") by multiplying the Total Average Weekly Sales lost figure by each Employer's Pre–Strike Sales Share.

(v) The CPA will compute the dollar difference for each Employer between the Employer's Dollar Change in Sales and the Dollar Sales Redistribution. The resulting amount shall be identified as the ("Sales Sharing Amount") [*sic*].

(vi) The CPA will compute a presumed redistribution of lost sales ("the Dollar Sales Redistribution") by multiplying the Total Average Weekly Sharing Amount by fifteen percent (15%) and then multiplying the result by the number of weeks in the Strike/Lockout Period. (See Exhibit A attached hereto.) The Employer(s) due reimbursement under this section is/are the one(s) whose total average weekly sales lost during the Strike/Lockout

period [*sic* ] exceeds the redistributed amount.